Gary M. APTER, Appellant–
Respondent,

v.

Victoria (Apter) ROSS, Appellee–
Petitioner.

No. 49A05–0203–CV–136.

Court of Appeals of Indiana.

Jan. 16, 2003.

David W. Stone IV, Stone Law Office & Legal Research, Anderson, IN, Gale M. Phelps, Phelps & Fara, Indianapolis, IN, Attorneys for Appellant.

Maxine T. Bennett, Indianapolis, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Gary Apter challenges the trial court's judgment modifying the joint custody order and child support order between him and his former wife, Victoria Ross. Gary argues that the trial court erred in refusing to admit into evidence a recorded phone conversation between Victoria and their daughter because it found that the recording violated federal wiretap laws. Gary also argues that the trial court abused its discretion in disregarding the testimony of private investigators that Gary hired. Based on the recording, the private investigators' testimony, and other evidence, Gary argues that the trial court abused its discretion in modifying the joint custody order and in awarding sole legal custody of the children to Victoria rather than him. Next, Gary argues that the trial court erred in ordering him to purchase a certain type of medical coverage for the children and in modifying child support because it improperly imputed income to him and because it used the wrong child support formula. Finally, Gary argues that the amount of attorney fees awarded by the trial court was incorrect.

Because the recording of the phone conversation was made on Gary's home phone and because as a parent with joint legal custody Gary had the power to consent on his minor daughter's behalf to the recording of her phone conversation, we find that the trial court erred in refusing to admit the contents of the recording. Nevertheless, because the evidence before the court reveals that the joint custody arrangement was placing the children's mental and physical welfare at risk and the children adamantly expressed their desire to remain in the custody of their mother, we find that the trial court did not abuse its discretion in modifying the joint custody order and in awarding Victoria sole legal custody. However, because the trial court improperly imputed income to Gary when calculating Gary's child support payment, we reverse the child support modification and remand with instructions for a recalculation. In addition, we find that the trial court awarded attorney fees that were not fully supported by the evidence in the record, and we reverse the award and remand with instructions for the trial court to determine what attorney fees are appropriate based on fees actually incurred by Victoria.

### Facts and Procedural History

Gary and Victoria are the parents of two children, N.A. and A.A. N.A. was born on April 29, 1986, and A.A. was born on May 30, 1988. Gary and Victoria were divorced pursuant to a Dissolution Decree entered on January 24, 1989. Victoria was originally awarded sole legal custody of N.A. and A.A. However, in 1994, Victoria began preparations to move from Marion County, Indiana, to St. Louis, Missouri, with N.A., A.A., and her second husband, Eddie Hurwitz. As a result, Gary filed a Petition to Restrain the Removal of the Children from Jurisdiction and for Custody. On October 12, 1994, the trial court modified its custo-

dy order awarding joint legal custody while allowing Victoria to move to Missouri and retain primary physical custody of the children.

After the move to Missouri, Victoria and Hurwitz had one child. In 1999, Victoria and Hurwitz divorced. Following her divorce from Hurwitz, Victoria began working as a secretary and sales person for an investment company. Gary also remarried following his divorce from Victoria. Gary and his wife, Peggy, have one child together, and two of Peggy's children from a previous relationship live with them in their home. Gary owns a real estate investment business that buys distressed properties, rehabilitates them, and then resells or rents them.

In addition to the legal proceedings surrounding Victoria's move to Missouri, Gary and Victoria engaged in a series of legal disputes after the dissolution of their marriage involving custody, visitation, and child support. Originally, no child support order was entered because Gary was incarcerated at the time of the divorce decree; however, on November 23, 1992, an agreed entry of modification was filed in which Gary was ordered to pay $900 per month in child support. On March 30, 1995, the trial court approved an agreed entry of modification that increased the child support payment to $1450 per month. In its Findings of Fact, Conclusions of Law and Orders from February 2, 1998 (1998 Order), the trial court ordered that the child support order should again be modified to the sum of $439 per week, which could be payable monthly in the sum of $1902. In addition, both parents filed numerous other motions seeking custody and visitation modifications.

This appeal stems from Gary's Petition for Modification of Custody filed on May 30, 2000, Victoria's Motion for Modification of Child Support and Related Benefits filed on August 14, 2000, her Motion for Modification of Visitation filed on February 9, 2001, and her Motion for Rule to Show Cause filed on February 28, 2001. The trial court held hearings on these motions on February 12, 2001, July 10–11, 2001, and August 7, 2001. During the hearings, Gary submitted a transcript of a taped phone conversation between Victoria and N.A., which the trial court determined was inadmissible. Appellant's App. p. 333–34. Gary also offered the testimony of private investigators who conducted surveillance on Victoria; however, the trial court found this testimony not to be reliable. Appellant's App. p. 330. On October 11, 2001, the trial court issued its Findings of Fact, Conclusion of Law and Order (2001 Order). In the 2001 Order, the trial court terminated joint custody, awarded sole legal and physical custody to Victoria, reorganized the visitation schedule, ordered that the child support order should be modified to the sum of $571 per week, and ordered Gary to replace his medical insurance policy for N.A. and A.A. In addition, the trial court ordered Gary to pay $6,664.84 representing the arrearage in retroactive child support to Victoria, $25,057.25 in attorney fees to Maxine Bennett, and $1510 in attorney fees to Leonard Frankel. Gary now appeals this judgment. Additional facts will be provided as necessary.

## Discussion and Decision

Gary raises a number of issues on appeal challenging the trial court's 2001 Order. Gary argues that the trial court erred in finding in its 2001 Order that the contents of a recorded phone conversation between Victoria and N.A. were inadmissible and that Gary's hired private investigators were unreliable. Next, Gary argues that the trial court erred in concluding that child custody should be modified so that sole legal custody of the children was

awarded to Victoria. Gary also argues that the trial court erred in modifying child support because it ordered him to purchase medical insurance for the children with a deductible that was too low and because it improperly imputed income to him and used inconsistent formulas in calculating the amount of weekly child support Victoria should receive. Finally, Gary argues that the trial court abused its discretion in awarding attorney fees to Victoria because the amount awarded to her included duplicate expenses and expenses for work that was never performed.[1]

▇▇▇ In this case, neither party requested the trial court to enter specific findings of fact and conclusions thereon. Instead, the trial court asked the parties to submit proposed findings and then entered findings of fact and conclusions on its own motion. Tr. p. 480–81. When the trial court enters such findings *sua sponte*, the specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *Brinkmann v. Brinkmann*, 772 N.E.2d 441, 444 (Ind.Ct.App.2002). The specific findings will not be set aside unless they are clearly erroneous, and we will affirm the general judgment on any legal theory supported by the evidence. *Hanson v. Spolnik*, 685 N.E.2d 71, 76 (Ind.Ct.App.1997), *trans. denied*. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *Id.* at 76–77. In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 77. Rather, we consider only the evidence and reasonable inferences drawn therefrom that support the finding. *Id.*

## I. Tape Recording

Gary argues that the trial court erred when it failed to admit a recording that Gary made on his home phone's answering machine of a phone conversation between N.A. and Victoria. The phone conversation took place during N.A.'s summer visitation at Gary's home and occurred during the pendency of this custody suit. A transcript of the recording reads in pertinent part:

Victoria: Yeah, I just don't really have the money. I got to come up with money for this guardian ad litem to protect you guys and I don't know how much this is going to cost.

N.A.: What's that?

Victoria: Guardian ad litem. It's like your own legal representation.

N.A.: You don't have to do that Mom.

Victoria: What?

N.A. You don't have to do that.

Victoria: Yeah, I do.

N.A.: No you don't. We pretty much already won.

Victoria: Well, don't don't don't don't don't. I know it seems . . . .

N.A.: (laugh)

Victoria: But don't think that you have. I have already had a talk with [A.A.] about that. In other words, don't let your guard down because you think that. So you still have to sit there with the fear that it can happen which means you have to be very verbal and open about what you want and what you don't want and what goes on in Indianapolis and what you would do if it did happen. Like, you know, you told me you would, you've already fig-

---

1. Gary does not appeal the trial court's modification of the visitation schedule; therefore, we do not address this issue.

ured out how to get out of the window and you would run away and all that. You cannot forget those things and you have to be very specific with that stuff to the guardian ad litem, to [the psychiatric social worker], and to the judge. I am telling you don't go with the fact that just because [the psychiatric social worker] says, well you know, I believe everything that you are saying and, you know, I believe your mom, and I believe what you are saying about your mother, you know, and there is nothing to worry about. Well, when you start thinking that way you let you[r] guard down and you think well, I, you know, there's no way that he's going to get me so I don't need to say this and I and don't need to say that, and I don't need to say, you know, remember the fear where you said you would go on a hunger strike, those are things that you have to keep saying because that's the truth and that's how you felt. But don't go and let your guard down on that because then it doesn't look like it is that serious to you. Okay?

N.A.: Um, huh.

Victoria: I am telling you. Believe me. Alright? Because somebody is playing very hard ball and, you know, you just don't do that. So yes we do need that. Because that guardian ad litem, your father is just going to get there and try to prove as much as he can that you guys don't, should not be here. And so you have to be very verbal about [it] and be honest about what you want.

Exhibit 47, p. 6–7.

◼ Generally, the admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *R.R. Donnelley & Sons Co. v. N. Texas* *Steel Co., Inc.,* 752 N.E.2d 112, 126 (Ind. Ct.App.2001), *reh'g denied, trans. denied.* We will reverse a trial court's decision only for an abuse of discretion, that is, when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.* at 126–27. In *Lamar v. State,* 258 Ind. 504, 282 N.E.2d 795 (1972), the Indiana Supreme Court laid out the following five foundational requirements for the admission of a tape recording into evidence:

(1) That it is authentic and correct;

(2) That the testimony elicited was freely and voluntarily made, without any kind of duress;

(3) That all required warnings were given and all necessary acknowledgments and waivers were knowingly and intelligently given;

(4) That it does not contain matter otherwise not admissible into evidence; and

(5) That it is of such clarity as to be intelligible and enlightening to the jury.

258 Ind. at 513, 282 N.E.2d at 800; *see also Bryan v. State,* 450 N.E.2d 53, 58–59 (Ind.1983). However, our supreme court later clarified that "[a]s to requirements (2) and (3), it is clear these apply only when the tape recording is of a statement by the accused made during a custodial interrogation such that the requirements of *Miranda v. Arizona* ... and its progeny apply to the admission of the statement itself." *Bryan,* 450 N.E.2d at 59; *see also Matter of Sheaffer,* 655 N.E.2d 1214, 1219 n. 5 (Ind.1995); *but see Knotts v. Knotts,* 693 N.E.2d 962, 966 (Ind.Ct.App.1998) (holding that all five requirements of the *Lamar* test must be established in order to admit a tape recording in a custody determination), *trans. denied; Wells v. Wells,* 489 N.E.2d 972, 974 (Ind.Ct.App. 1986) (citing *Ind. Bell Tel. Co. v. O'Bryan,* 408 N.E.2d 178, 185 (Ind.Ct.App.1980)) (holding that four of the requirements of

the test were needed to admit a tape recording in a custody determination); *Ind. Bell Tel. Co.*, 408 N.E.2d at 185; *Jackman v. Montgomery*, 162 Ind.App. 558, 561–65, 320 N.E.2d 770, 773–75 (1974) (holding that all the requirements of the *Lamar* test with the exception of the warnings requirement, which was applicable only to statements taken from criminal defendants, were needed to admit tape recordings in civil cases).

■ We see no reason why the admission of a tape recording in a civil case would have a stricter test than the admission of tape recording in a criminal case that does not involve a custodial interrogation. Therefore, we find that in civil cases, a tape recording is admissible if only these three foundational requirements are met: (1) that it is authentic and correct; (2) that it does not contain matter otherwise not admissible into evidence; and (3) that it is of such clarity as to be intelligible and enlightening to the jury.

In excluding the tape recording and a transcript of the recording, the trial court in this case did not question whether the tape was authentic or correct or whether it was intelligible. Instead, the trial court focused on the second requirement and found:

> 30. The Father failed to establish that he recorded [N.A.]'s telephone conversations with the Mother out of any genuine concern for the protection of [N.A.]'s welfare. [N.A.] demonstrated no distress as a result of the conversations with her Mother. The Father did not establish that his actions constituted an acceptable exception to the Federal wire-tapping law. Even if they had, the appropriate warnings and consents were not given to allow the tape and transcript to be admitted under 18 U.S.C. § 2511.

Appellant's App. p. 333–34. Therefore, we will address whether the tape recording was admissible under federal wire-tapping law and Indiana's own wire-tapping law.

### A. Federal Wiretap Act

Gary asserts that because a parent is allowed to listen to and record a phone conversation in which the parent's minor child is participating, the trial court erred in finding that the taped phone conversation should have been excluded pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* (the Federal Wiretap Act). The Federal Wiretap Act provides:

> Except as otherwise specifically provided in this chapter any person who—
>
>> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> . . . .
>
>> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
>
> . . . .
>
> shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1). Section 2515 of the Federal Wiretap Act is an exclusionary rule that provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any

court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515; *In re Marriage of Lopp,* 268 Ind. 690, 700, 378 N.E.2d 414, 419 (1978). The legislative history of the Federal Wiretap Act establishes that the exclusionary rule of § 2515 "was meant to apply in both federal and state proceedings, and is not meant to be limited to criminal proceedings." *Id.* at 420.

■ While the Federal Wiretap Act prohibits the interception and introduction into evidence of telephone communications unless one party to the communications gives consent or a court order is obtained authorizing the interception of the telephone conversations, the statute also contains an "extension telephone exemption." *Scheib v. Grant,* 22 F.3d 149, 153 (7th Cir.1994). The extension telephone exemption provides:

(5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business....

18 U.S.C. § 2510(5)(a); *Scheib,* 22 F.3d at 153–54. In *Scheib,* the Seventh Circuit found that "[r]eading this extension phone

exemption as a whole, then, it is no lexical stretch to read this language as applying to a 'subscriber's' conduct—or 'business'— in raising his or her children." 22 F.3d at 154. The Seventh Circuit went on to add, "We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for the child's well-being." *Id.*

■ A parent's concern for a child's well-being must be the purpose in taping the phone conversation. *Id.* at 154–55. The Seventh Circuit emphasized that it is a parent's motivation and not the child's actual well-being that is important in determining this issue. *Id.* at 155 n. 5. In this case, the trial court found that, "The Father failed to establish that he recorded [N.A.]'s telephone conversations with the Mother out of any genuine concern for the protection of [N.A.]'s welfare. [N.A.] demonstrated no distress as a result of the conversations with her Mother." Appellant's App. p. 333. However, we conclude that the evidence before the trial court does not support that finding.

■ The only evidence presented to the trial court involving the circumstances of the recording of the phone conversation was Gary's testimony:

Q. What is your reason for having transcribed this?

A. Well, the way [N.A.] behaved ... she was on the phone talking openly to her mom. We were outside by the pool. And she got all hushed and she ran inside, and it caused me to think, with everything pending, something was going on.

Q. So you just press a button and it recorded the conversation?

A. Yes.

Q. Based upon what you recorded, are you concerned about pressure being put

on either one of your children in regards to this case?

A. I'm extremely concerned about that pressure.

Tr. p. 152–53. While the trial court is correct that the evidence did not establish that N.A. was actually distressed by the phone conversation with her mother, the evidence demonstrates that Gary's concern for his daughter's welfare was supported by N.A.'s appearance and actions while she was on the phone with her mother. As it is a parent's motivation and not the child's actual well-being that is important in determining the applicability of the extension telephone exemption, we conclude that the facts in this case establish that Gary's concern for his child was his purpose in taping the phone conversation. Therefore, we hold that the tape recording does not violate the Federal Wiretap Act.

### B. Indiana Wiretap Act

Gary also argues that the tape recording of his daughter's phone conversation does not violate Indiana Code article 35–33.5 (the Indiana Wiretap Act.). The Indiana Wiretap Act provides:

(a) This section does not apply to a person who makes an interception authorized under federal law.

(b) A person who knowingly or intentionally intercepts, a communication in violation of this article commits unlawful interception, a Class C felony.

(c) A person who, by virtue of the person's employment or official capacity in the criminal justice system, knowingly or intentionally uses or discloses the contents of an interception in violation of this article commits unlawful use or disclosure of an interception, a Class C felony.

Ind.Code § 35–33.5–5–5; *State v. Lombardo,* 738 N.E.2d 653, 655 (Ind.2000). The Indiana Wiretap Act defines "interception" as follows:

"Interception" means the intentional:

(1) recording of; or

(2) acquisition of the contents of;

a telephonic or telegraphic communication by a person other than a sender or receiver of that communication, without the consent of the sender or receiver, by means of any instrument, device, or equipment under this article. This term includes the intentional recording of communication through the use of a computer or a FAX (facsimile transmission) machine.

Ind.Code § 35–33.5–1–5; *Lombardo,* 738 N.E.2d at 655.

Like its federal counterpart, the Indiana Wiretap Act also contains an exclusionary rule. Under the Indiana Wiretap Act's exclusionary rule:

The contents of an interception under this article or evidence derived from the interception may not be received into evidence or otherwise disclosed during a court proceeding unless each party, not less than fourteen (14) days before the proceeding, has been furnished with a copy of the application, warrant, and any orders for an extension under which the interception was authorized. The fourteen (14) day period may be waived by the court if the court finds that:

(1) it is not possible to furnish each party with the information at least fourteen (14) days before the proceeding; and

(2) a party will not be prejudiced by the delay in receiving the information.

Ind.Code § 35–33.5–5–1.

In arguing that the recording of his daughter's phone conversation does not violate the Indiana Wiretap Act and that the contents of the tape recording should have been admitted into evidence, Gary

relies on the language of the Indiana Wiretap Act, which reads, "[t]his section does not apply to a person who makes an interception authorized under federal law." I.C. § 35–33.5–5–5(a). Gary asserts that this language incorporates the extension telephone exemption of the Federal Wiretap Act into the Indiana Wiretap Act. However, our Indiana Supreme Court already rejected this argument in *State v. Lombardo.* 738 N.E.2d at 658. In *Lombardo,* our supreme court ruled that through this language "our legislature did not intend to directly incorporate the Federal Wiretap Act statutory or case law into Indiana's Act but instead meant to exempt from its provisions federal law enforcement surveillance activities within Indiana's borders." *Id.* at 660. Therefore, we find that the Federal Wiretap Act's extension telephone exemption is not incorporated into the Indiana Wiretap Act. In addition, the Indiana Wiretap Act on its own does not contain language that could be construed as an extension telephone exemption.

■■■■ Nevertheless, we find that Gary's recording of his daughter's phone conversation does not violate the Indiana Wiretap Act and the contents of the tape recording are admissible into evidence because the tape recording in this case does not qualify as an "interception." Under the Indiana Wiretap Act, the recording of a telephonic or telegraphic communication is not an "interception" if it is done with the consent of the sender or receiver of the communication. I.C. § 35–33.5–1–5. Under Indiana Code 29–3–3–3(a):

> *Except as otherwise determined in a dissolution of marriage proceeding, a custody proceeding,* or in some other proceeding authorized by law, including a proceeding under section 6 of this chapter or another proceeding under this article, and unless a minor is married, *the parents of the minor jointly* (or the survivor if one (1) parent is deceased), if not an incapacitated person, *have,* without the appointment of a guardian, giving of bond, or order or confirmation of court, *the right to custody of the person of the minor and the power to execute the following on behalf of the minor:*
>
> . . . .
>
> (5) *Consents,* waivers of notice, or powers of attorney *under any statute,* including the Indiana inheritance tax law (IC 6–4.1) and the Indiana adjusted gross income tax law (IC 6–3).

(emphasis added). Pursuant to Indiana Code § 29–3–3–3(a), we conclude that a parent has the power to consent on behalf of his or her minor child to the recording of that child's phone conversations unless otherwise curtailed in some legal proceeding.

At the time that Gary recorded the telephone conversation between N.A. and Victoria, Gary's right to consent to the recording of his daughter's telephone conversation was not curtailed in any matter. In fact, while Victoria maintained primary physical custody of the children, the trial court's 1994 award of joint legal custody meant that they shared authority and responsibility for the major decisions concerning their children's upbringing. *See* Ind.Code § 31–9–2–67. As a parent with joint legal custody, Gary had the power to consent to the recording of his minor daughter's telephone conversation. The trial court's joint custody order also instructed that:

> The parents shall consult with each other prior to making any major decisions regarding the children, including but not limited to education, health care and religious training. In the event that the parents are unable to agree on a course of conduct, then any relevant third par-

ties such as counselors, physicians, educators, or religious advisors are to be consulted and their input given due consideration by both parents.

Appellant's App. p. 45. While we recognize that Gary had a duty to consult with Victoria prior to making any major decisions regarding the children, we find that this consultation requirement did not apply when Gary's decision to record a conversation was motivated out of concern for his daughter's welfare while she was on the phone with her mother. The joint custody order did not curtail Gary's power to consent on behalf of his daughter. Therefore, we find that Gary had the authority in this case to consent on N.A.'s behalf to the recording of her phone conversation without prior consultation with Victoria.[2] Thus, we hold that the recording did not violate the Indiana Wiretap Act and that the trial court abused its discretion in excluding the tape recording and its contents.

## II. Private Investigator Testimony

■ Gary also asserts that the trial court erred in disregarding the testimony of private investigators whom Gary hired to watch Victoria in Missouri and who testified that Victoria would occasionally leave the children unattended at night. Gary argues that the trial court abused its discretion in discounting the investigators' testimony on the basis that the investigators were not licensed in the state of Missouri, even though no evidence was presented that established that private investigators require a license in Missouri. However, we note that in its 2001 Order the trial court only found:

19. The Father hired unlicensed private investigators to conduct lengthy surveillance of the Mother and all of her activities. The investigators' testimony was neither reliable nor persuasive, and no evidence provided by the Father indicated to any degree whatsoever that the children were being neglected.

Appellant's App. p. 330. While the trial court acknowledged that the private investigators did not have licenses, it did not state that its finding was based on that fact. In the end, the trial court's finding revolved on its determination of the private investigators' credibility and the weight that it gave their testimony, not on the status of their private investigators' licenses. Therefore, the trial court's finding involves a credibility issue not a legal one. Victoria gave an account of her activities that was completely different than the private investigators' testimony. In reviewing the trial court's findings, we are not in the position to judge the credibility of the witnesses or to reweigh the evidence. *See Hanson*, 685 N.E.2d at 77. It is the trial court's place to determine which witness is credible or not, and we cannot conclude that this finding is clearly erroneous.

## III. Child Custody

■ Gary asserts that the trial court abused its discretion in denying his motion for custody while modifying the joint custody arrangement and granting Victoria sole legal custody of N.A. and A.A. In general, we review custody modifications for abuse of discretion, with a "preference for granting latitude and deference to our trial judges in family law matters." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind.2002). In the initial custody de-

2. However, we caution that this type of unilateral action taken by a parent with joint legal custody, while legally authorized in certain situations, is anathematic to a successful joint custody arrangement and can be evidence that joint custody is not in the best interests of the child.

termination, both parents are presumed equally entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating that the existing custody should be altered. *Id.* A court may not modify a child custody order that granted joint legal custody unless (1) the modification is in the best interests of the child; and (2) there is a substantial change in one or more of the factors a court may consider under Indiana Code § 31–17–2–8 when it originally determines custody. *See* Ind.Code § 31–17–2–21; *Farag v. De-Lawter,* 743 N.E.2d 366, 369 (Ind.Ct.App. 2001); *Kanach v. Rogers,* 742 N.E.2d 987, 989 (Ind.Ct.App.2001); *but see Carmichael v. Siegel,* 754 N.E.2d 619, 635 n. 7 (Ind.Ct. App.2001) (holding that the standard for modifying custody under Ind.Code § 31–17–2–21 does not apply to modifications changing a joint legal custody arrangement to sole legal custody). The factors listed in section 8 are as follows:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

 (A) the child's parent or parents;

 (B) the child's sibling; and

 (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

 (A) home;

 (B) school; and

 (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian. . . .

Ind.Code § 31–17–2–8; *Farag,* 743 N.E.2d at 369.

In arguing at the custody hearings that the joint custody arrangement should be modified so that he should receive sole custody of N.A. and A.A., Gary presented evidence that N.A. received some poor grades at school. Gary introduced testimony from private investigators that he hired which indicated that Victoria left the children unattended late at night. Gary also presented the deposition of Eddie Hurwitz, Victoria's second husband. Hurwitz testified that after his divorce with Victoria, there were nights that he would drive by Victoria's house and determine that she had left her children in the house unattended. In addition, Gary presented the contents of the recorded phone conversation between N.A. and Victoria in which Victoria coached N.A. on what to tell the trial court during the custody hearing.

On appeal Gary reiterates this evidence and the reasons why he believes the children should be in his custody; however, this is an invitation to reweigh the evidence that we must decline. The trial court found:

> 26. The Father did not sustain his burden of proof to demonstrate by clear and convincing evidence that the children are being abused or neglected in Mother's home, nor that continued custody in the Mother is not in the best interests of the children, nor that the children have suffered any ill effects from her primary custody.

Appellant's App. p. 332. In finding that the children should remain in the physical custody of their mother, the trial court noted that during an *in camera* interview both children "adamantly expressed the desire to remain in the St. Louis area, and in the custody of their Mother." Appel-

lant's App. p. 329. The trial court also found that the private investigators hired by Gary were not reliable or persuasive. The trial court was able to weigh the testimony of the witnesses and to decide whether Gary provided sufficient evidence to demonstrate that the existing custody should be altered. We cannot say that the trial court clearly erred in finding that Gary did not meet his burden.

■■■■■ As we discussed earlier, we find that the trial court erred in excluding the contents of the recording that Gary made of the phone conversation between Victoria and N.A. While we condemn Victoria's coaching of N.A. as to what to say during the custody hearing, we do not find that the trial court's error in failing to admit this evidence warrants a reversal on the issue of whether Gary was entitled to sole custody. Victoria's coaching of the children made them active participants in a legal competition with their father and was potentially damaging to the children's relationships with both parents. In addition, Victoria's actions created some question as to the voluntariness and sincerity of the children's request to remain with their mother. However, while the recording should have been admitted into evidence, it does not appear that the trial court's finding would have changed because of its contents. In determining whether evidentiary error requires reversal, we assess the probable impact upon the trier of fact. *Marchal v. Craig*, 681 N.E.2d 1160, 1163 (Ind.Ct.App.1997). In a case tried before the bench, the harm caused by evidentiary error is lessened and we will reverse only when the court's judgment has apparently or obviously been infected by erroneously admitted evidence. *Id.* The trial court had an opportunity to speak to both of the children *in camera*, and after its opportunity to evaluate the sincerity of the children's request, the trial court found that the children were adamant in their desire to remain in the physical custody of their mother. Therefore, we find that the contents of the recording do not warrant a reversal of the trial court's decision not to grant Gary sole legal custody.

In addition, we conclude that the trial court did not abuse its discretion in modifying custody so that Victoria received sole legal custody. In ordering that joint custody should not be maintained, the trial court entered the following findings documenting the tension in the joint custody arrangement:

16. The children became adapted to the area, and are enrolled there in school, are functioning within their respective capabilities, and are active in their Synagogue and sports, and have friends there. Both children, in camera, adamantly expressed the desire to remain in the St. Louis area, and in the custody of their Mother. Both children expressed distress over the efforts of the Father to seek their custody, and the fact that the Father has persisted over the objections of the children. The efforts by the Father have damaged the parental relationship with the Father. A transfer of custody to the Father, and a move to Indianapolis, would likely have a further damaging effect upon the children's happiness and their relationships with their Father.

. . . .

22. Pursuant to the testimony of both parents, Father was permitted to participate in [N.A.]'s Bat Mitzvah. Mother made the plans and Father paid for a majority of the cost. Part of the Father's basis for seeking the children's custody was that he perceived that he and his family were treated unfairly in the seating at [N.A.]'s Bat Mitzvah in March 2000. The evidence does not sustain his position in that regard.

23. At the time of [A.A.]'s Bar Mitzvah, Father and his family were not invited to the party, and Father was not asked to participate financially. Father had to petition the Court to obtain time to share in this once in a lifetime event.

24. It is clear that the disputes of the parents marred both religious celebrations, which should have been a time of family unity and support for the children. The Court finds that the parent's inability to cooperate in religious decisions further justifies a change in the joint custody arrangement.

. . . .

32. All of the testimony provided clearly demonstrated a mutual lack of trust between Father and Mother, and an abject inability to communicate reasonably with an eye to the best interests of the children. Thus far, the acrimony between them has been damaging to the children. Joint custody has provided no benefits to the children. Those things considered, and given the distance between the parents homes, the Court finds that it is not in the children's best interests that joint custody be maintained.

Appellant's App. p. 329–34.

■ Generally, lack of cooperation or isolated acts of misconduct between the parents cannot serve as a basis for the modification of child custody. *See Hanson,* 685 N.E.2d at 78. However, if parents with joint legal custody have made child rearing a battleground to the point that they have placed their child's mental and physical welfare at stake, the trial court may modify the custody order. *See id.* The trial court found and the record reveals that both parents were uncooperative with each other and unable to communicate reasonably for the best interests of the children to the point that joint custody had not only become unworkable, it was damaging to the children. Based on the trial court's finding that the joint custody situation was placing the children's welfare at stake and on its finding that the children were adapted to their home in St. Louis and adamantly expressed their desire to remain there, we find that the trial court did not abuse its discretion in modifying the joint custody order and awarding sole legal custody to Victoria.

## IV. Child Support

■ Gary asserts that the trial court abused its discretion in determining child support. Specifically, Gary asserts that the trial court abused its discretion in ordering him to provide medical coverage with a $250 per child per year deductible. Gary also claims that the trial court erred in calculating his child support because it used inconsistent formulas from one proceeding to the next to calculate his available income and in imputing income to him. The modification of a child support order requires a showing of "changed circumstances so substantial and continuing as to make the terms unreasonable." Ind. Code § 31–16–8–1; *Glass v. Oeder,* 716 N.E.2d 413, 416 (Ind.1999). "Modification of a child support order involves a factual determination that substantial and continuing, changed circumstances render existing terms unreasonable." *Glass,* 716 N.E.2d at 416. The Indiana Child Support Guidelines require a trial court to determine the proper level of child support by calculating each parent's weekly gross income. *Id.*

### A. Insurance Policy

■ Gary asserts that the trial court erred in ordering him to purchase medical coverage for the children with a deductible of $250 per child per year. In the 2001 Order, the trial court made the following finding.

39. The 6% rule should apply ... effective with the date upon which the Father activates medical insurance for the children with a deductible of $250 per child per year. Father agreed to replace the medical insurance which he had previously provided which had a $1000 deductible per child per year.

Appellant's App. p. 338. At trial, evidence was presented that N.A. and A.A. had medical coverage that annually had a $1000 deductible per child while the deductible on the medical coverage that Gary purchased for himself, his wife, and their child had a deductible of $500 per person. Tr. p. 196. While Gary agreed that he would purchase a better policy for N.A. and A.A., Gary only agreed that he would be willing to give A.A. and N.A. a policy that would have the same benefits that he, his wife, and his other child enjoyed. Tr. p. 197. The trial court's only explanation for ordering Gary to purchase medical coverage for the children with $250 deductibles was that Gary agreed to it. However, because the evidence shows that Gary only agreed to purchase medical coverage that provided the same benefits as the policies that he had for the rest of his family and those policies had $500 deductibles, we find that the trial court clearly erred in finding that Gary should purchase medical coverage with $250 deductibles.

### B. Child Support Calculation

 Gary also argues that the trial court abused its discretion in calculating his child support payments because it used a formula inconsistent with the one used in the 1998 Order and because it improperly imputed income to him. For the purpose of determining whether there was a substantial change in circumstances justifying the modification of a child support obligation, it is improper for a trial court to use inconsistent formulas from one proceeding to the next in calculating an obli-gor's available income. *Carmichael,* 754 N.E.2d at 627 (citing *In re Marriage of Wiley,* 444 N.E.2d 315, 318 (Ind.Ct.App. 1983)). With regards to imputing income, the trial court enjoys wide discretion to ensure the child support obligor does not evade his support obligation. *Glover v. Torrence,* 723 N.E.2d 924, 936 (Ind.Ct. App.2000).

In its 1998 Order, the trial court found: 3. The determination of Father's gross income for purposes of determining child support presents a somewhat formidable calculation due to the fact that Father is self-employed in the business at [buying] and selling distressed real estate. Father's business is essentially to purchase distressed real estate at Sheriff's sales, tax sales or by other means, then to rehabilitate the property utilizing construction crews and then to sell the property or to lease the property with option to purchase. This is a capital intensive business because Father must maintain substantial sums of cash and/or cash flow in order to continue to purchase real estate. Once the real estate is purchased and rehabbed, he can obtain 75% loan to value but must still maintain a large inventory of real estate which is continually being turned over through sale purchase of new properties by reinvesting capital in order to continue to generate income.

. . . .

5. Pursuant to Father's testimony, the Court finds that Father pays himself a draw of $15,000 per month for a total net personal income of $180,000 per year after payment of federal and state income taxes. Pursuant to Father's 1996 federal income tax return ... he paid $137,219.00 in federal income taxes and pursuant to his testimony paid $23,744.00 in state income taxes which resulted in a total income of $340,963.00

when added to his draw. Father's gross income for income tax purposes as reflected on his 1996 federal income tax return was $542,009.00 after depreciation. The difference between the gross income listed on Father's tax return and his income from draw and for payment of taxes in the sum of $340,963.00 is $201,046.00. This is essentially the amount of capital reinvested by Father in the year 1997 to maintain his real estate enterprise. Pursuant to support Guideline 3.A.2., self-employment, business expenses, in-kind payments and related issues; the Court finds that these capital expenditures constitute "a reasonable yearly deduction for necessary capital expenditures" to maintain a business which should be deducted from weekly gross income from self-employment and the operation of his business, as is allowed by the guidelines. After deduction of reasonable capital expenditures and business expenses, Father's annual gross income is the sum of $340,963.00.

Appellant's App. p. 96–97.

The Child Support Guidelines provide specific directions for calculating income for self-employed persons. *Glass,* 716 N.E.2d at 416. The Guidelines instruct that "[w]eekly gross income for the self-employed is calculated by subtracting 'ordinary and necessary expenses' from gross receipts and 'may include a reasonable yearly deduction for necessary capital expenditures.'" *Id.* (quoting Child Supp. G. 3(A)(2)). Recognizing that Gary's income came from his own business and that his business of buying, refurbishing, and then reselling homes was capital intensive, the trial court in its 1998 Order allowed Gary to take the depreciation in his properties and to subtract the amount of money reinvested to purchase and remodel additional properties from his business's gross income of $542,009. Therefore, in determining Gary's gross income for child support purposes, the trial court started at $340,963, the amount of money that Gary paid in taxes added to his personal draw from the business. From this base amount the trial court made additional adjustments because of Gary's additional child, his tax rate, and the amount of visitation time. Appellant's App. p. 97–98.

■ However, in its 2001 Order, the trial court used the following formula to calculate Gary's available income:

35. The Father is in business for himself and is the owner of Apter Properties, LLC and 64th Street, LLC. Apter Properties purchases distressed properties, improves them and sell or rents them. His 1998 tax return reflects $525,875 in net business income, not including about $30,000 in depreciation. .... In 1999, father had $568,722 in income, not including approximately $100,000 in depreciation.... His 2000 income was $676,408, including depreciation of approximately $20,000.... The Father requested additional consideration for the excess tax he pays for his high income. The business provides leases on the family vehicles. The evidence reflects that the Father takes maximum advantage of the tax rates, files a joint return and enjoys three exemptions, and claims nearly $20,000 yearly on his home mortgage interest, and he is not entitled to additional relief.

36. By trial, Father had amended his financial declaration to reflect a weekly gross income of $10,273 (or $534,196 per year) without adding back depreciation. His 2000 tax return reflects $676,408 subject to "add back" for depreciation and credit for one-half of his self-employment tax. Father has attempted to seek equity with unclean hands, by avoiding discovery and then trying to

take advantage for his personal gain, at the cost of the children of lost child support. He admitted that he is buying fewer houses and has intentionally reduced his income. He has begun to pay his wife $600 per week to do nominal work in the business. He should be imputed $750,000 in potential income. Further, the children are entitled to the advantages they would have enjoyed had the marriage of their parents remained intact.

Appellant's App. p. 336–37. While it is improper for the trial court to use inconsistent formulas in calculating an obligor's available income to determine whether there has been a substantial change in circumstances warranting support modification, Gary's gross income for child support purposes in 2000 would still be $534,181.44 if the trial court had used the 1998 formula in calculating Gary's income. Even under the 1998 formula Gary's income increased from $340,963 to $534,181.44; therefore, we conclude that the trial court was correct in finding that there was a substantial change in circumstances warranting a modification of child support even though the court improperly used inconsistent formulas in reaching that decision.

Nevertheless, while we find that the trial court was correct in determining that there should be a modification of child support, we conclude that the trial court abused its discretion in calculating the child support. In its 2001 Order, the trial court not only relied on Gary's total business receipts to determine gross income for child support purposes rather than on the amount of taxes that Gary paid and the draws he took from his business, the trial court also imputed income to him. In concluding that income should be imputed to Gary the trial court abused its discretion.

. One of the three reasons that the trial court gave for imputing income was that it found that Gary had unclean hands because his amended financial declaration underrepresented his income. Gary's amended financial declaration included his child support obligation worksheet and his draw schedule from 2000, which documented every time that he paid himself from his business for the purpose of paying taxes and for his personal draw. Appellant's App. p. 259–62. While Gary's 2000 income tax returns reflected that he and his business had $676,408 in income, his draw schedule documented that Gary only took $558,300 from the business in order to pay taxes and for personal draw. Appellant's App. p. 262. Then applying the same tax rate adjustment used by the trial court in its 1998 Order, Gary documented that his gross income for child support purposes was $534,181.44. Appellant's App. p. 262. Gary used the same method for calculating his income as the trial court did in its 1998 Order; therefore, we find that the trial court abused its discretion in penalizing Gary for using that same formula.

■■■■■ The trial court also found that Gary should be imputed potential income because Gary admitted that he is buying fewer homes and thus had intentionally reduced his income. The Guidelines provide that a trial court may include a parent's potential income in weekly gross income if a parent is voluntarily unemployed or underemployed. Child Supp. G. 3(A)(3). At the same time, the Guidelines caution that the trial court must employ "a great deal of discretion" in its potential income determination. *Glass,* 716 N.E.2d at 418 (quoting Child Supp. G. 3(A) Commentary 2(c)). Child support should not be used "as a tool to promote a society where all work to their full economic potential, or make their career decisions based strictly upon the size of potential paychecks." *Pa-*

*ternity of Buehler,* 576 N.E.2d 1354, 1356 (Ind.Ct.App.1991). Consequently, there is no basis for determining that a parent is underemployed when the level of his or her earnings has remained relatively constant for a number of years. *Carmichael,* 754 N.E.2d at 626. While Gary admitted that his business's income was down in the first part of 2001 because he had not bought as many houses, the evidence still shows that Gary's yearly income was not only consistent, it was consistently increasing. Tr. p. 442. Gary's business's income rose from $542,009 in 1996 to $676,408 in 2000 and his own draw rose from $340,963 to $558,300. While it may have been possible for Gary to have reaped even greater benefits from his business, we find that based on Gary's increasing income, it is simply not reasonable to label him underemployed. Moreover, even if Gary bought fewer houses as a way to keep his income and child support down, the evidence shows that this occurred in 2001, not in 2000 when his income was at its highest. Therefore, we find that the trial court abused its discretion in imputing potential income to Gary when his yearly income was not only consistent but was increasing.

■ The final reason used by the trial court to justify the imputation of income was that it found that Gary was paying his wife $600 a week to do nominal work for the business. However, this finding is clearly erroneous as the only evidence concerning Gary's wife's salary came from Gary and Peggy's testimony, and this testimony reveals that Peggy was making $600 a month, not a week. Gary testified that Peggy made $600 a month since she began working part-time for his business in 2001. Tr. p. 175–76. Peggy testified that she worked for the business two days a week during the summer and two and a half days a week during the winter and that she was paid $9 an hour, which result-

ed in approximately $600 a month in salary. Tr. p. 224. As the trial court's finding was not supported by the evidence and the evidence in the record does not reveal that Gary was paying his wife an obviously excessive salary, we find that the trial court abused its discretion in using Gary's employment of his wife as a justification for imputing income. Without any sustainable reason for imputing additional income to Gary, we find that the trial court abused it discretion when it found that Gary should be imputed $750,000 in potential income.

■ Because the trial court abused its discretion in imputing income to Gary, we reverse on the issue of child support and remand to the trial court with instructions to recalculate Gary's gross income for child support purposes. In determining Gary's income on remand, the trial court should take into account Gary's additional child and the ordinary and necessary expenses and necessary capital expenditures that are needed to maintain Gary's real estate enterprise.

### V. Attorney Fees

■ Finally, Gary argues that the trial court abused its discretion in awarding $27,567.24 in attorney fees to Victoria. While Gary does not contest the trial court's decision to award attorney fees, he asserts that the trial court erred in relying on duplicate charges and charges for services that were never rendered in arriving at the total award. In post-dissolution proceedings, the trial court may order a party to pay a reasonable amount for attorney fees. Ind.Code §§ 31–16–11–1, 31–17–7–1; *Haley v. Haley,* 771 N.E.2d 743, 753 (Ind.Ct.App.2002); *Claypool v. Claypool,* 712 N.E.2d 1104, 1110 (Ind.Ct.App. 1999), *reh'g denied, trans. denied.* Trial courts enjoy broad discretion in awarding allowances for attorney fees. *Selke v.*

*Selke,* 600 N.E.2d 100, 102 (Ind.1992). Reversal is proper only where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court. *Id.* In assessing attorney fees, the court may consider such factors as the amount of assets awarded to the parties, the relative earning ability of the parties, and which party initiated the action. *Id.*

In its 2001 Order, the trial court made the following finding concerning attorney fees:

> 44. Mother has requested that Father pay her attorney fees and expenses in the amount of $28,557.24. The request is reasonable considering the complexity of the case. Father has clearly invested enormous funds in the prosecution of this case with little merit—far more than he could expect Mother to pay on her income. This Court has not previously ordered Father to pay any of Mother's attorney fees in his two prior unsuccessful actions for custody. Father should pay the additional sum of $26,057.24 to Maxine T. Bennett, Mother's attorney, and $1,510 to Leonard Frankel, Mother's Missouri attorney, all within thirty (30) days.

Appellant's App. p. 339–40. However, we find that this finding is clearly erroneous, as the evidence before the trial court reveals that a substantial amount of the requested attorney fees were not legitimate expenses.

The trial court's order was based on evidence presented by Victoria's counsel, Maxine Bennett, on the last day of the hearings. Bennett testified that Victoria's attorney fees as of August 7, 2001, were $28,567.24. Tr. p. 449. Victoria also introduced into evidence her deposition invoices

and Bennett's fee schedule, which documented Victoria's attorney fees. Exhibit V, Exhibit W. However, upon cross-examination, Bennett admitted that entries on the fee schedule of $192.62 and $1494 labeled "Deposition Expenses" were actually duplicates of billing contained on another exhibit. Tr. p. 450, 452–53. Bennett also admitted that a $1600 entry for a Full Day Custody Hearing on February 12, 2001, and an $800 entry for Preparation of Special Findings on February 12, 2001, were in error because neither event took place. Tr. p. 450–51. Finally, Bennett admitted that a $1500 entry for the July 10, 2001, hearing and the entries for pre-trial preparation that occurred on July 9, 2001, appeared twice on the exhibit.[3] Tr. p. 453–54. After acknowledging all of the mistakes on her fee schedule, Bennett asserted that she would resubmit a corrected version of Exhibit W, the fee schedule. Tr. p. 454. However, Bennett never filed a corrected version of Exhibit W amending these mistakes, and in Victoria's proposed Findings of Fact and Conclusions of Law filed on August 31, 2001, she proposed that the attorney fees equaled $28,557.24. Appellant's App. p. 287.

The trial court awarded $27,567.24 of the $28,557.24 in attorney fees that Victoria requested. However, Victoria's own attorney admitted that approximately $6800 to $7000 of the requested attorney fees were for duplicate expenses and for work that never happened. While the trial court has broad discretion in awarding a reasonable amount for attorney fees, awarding an amount that includes approximately $6000 in admitted double billing and overcharges is an abuse of that discretion. Therefore, we reverse the trial

---

**3.** One set of entries for the July 9, 2001, work totaled $1420 while the other set totaled $1280. Exhibit W.

court's award of attorney fees and remand for the trial court to recalculate the attorney fees to which Victoria is entitled.

## Conclusion

In conclusion, we find that the trial court erred in failing to admit the recording of the phone conversation between Victoria and N.A. but that it acted within its discretion in disregarding the testimony of Gary's private investigators. We conclude that the trial court did not err in finding that Gary did not meet his burden of demonstrating that the existing custody order should be altered in his favor and that Victoria should receive sole legal custody of the children. In addition, we find that the trial court abused its discretion in ordering Gary to purchase medical coverage for the children with a $250 deductible when Gary only agreed to buy one with a $500 deductible. We also find that the trial court erred in calculating Gary's child support because it improperly imputed income to him. We remand the issue of child support to the trial court with instructions to calculate Gary's child support taking into account Gary's business expenses and his additional child. Finally, we conclude that the trial court erred in awarding Victoria $27,567.24 in attorney fees because the award included a substantial amount of duplicate charges or charges for work that was never performed. On remand, the trial court should base any award of attorney fees on the accurate charges for the litigation leading up to the trial court's 2001 Order. We affirm the trial court's order in all other respects.

Judgment affirmed in part, reversed in part, and remanded with instructions.

NAJAM and BARNES, JJ., concur.