## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 12 2015, 10:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Trisha S. Dudlo
Kelly A. Lonnberg
Bamberger, Foreman, Oswald and
Hahn, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

David A. Guerrettaz
Molly E. Briles
Mary Lee Schiff
Ziemer Stayman Weitzel &
Shoulders, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Marriage of

Christina Estes (Sapp),

*Appellant-Respondent,*

v.

Shaun Allen Sapp,

*Appellee-Petitioner.*

May 12, 2015

Court of Appeals Case No.
87A05-1408-DR-384

Appeal from the
Warrick Circuit Court

The Honorable David O. Kelley,
Judge

Cause No. 87C01-1302-DR-269

**Kirsch, Judge.**

[1] In this post-dissolution matter, Christina Estes ("Mother") sought to relocate with the parties' minor child, K.S. Shaun Allen Sapp ("Father") filed a motion to modify custody and prevent the relocation. After a two-day evidentiary

hearing, the trial court ruled in Father's favor. Mother appeals, raising the following restated and consolidated issues:

> I. Whether the trial court erred in excluding certain counseling records that Mother tendered at the hearing;
>
> II. Whether the trial court's findings of fact and conclusions, denying Mother's request to relocate with K.S. and granting Father's petition to modify custody, were clearly erroneous; and
>
> III. Whether the trial court abused its discretion when it calculated child support.

We affirm.

## Facts and Procedural History

Mother and Father married in 2003. K.S. ("Child"), born in 2004, is their only child. Mother and Father separated in or around the fall of 2012, and on May 8, 2013, their marriage was dissolved pursuant to a decree of dissolution and settlement agreement. Under the terms of the settlement agreement, the parties shared joint legal custody of Child, and Mother was awarded primary physical custody of her, with Father having visitation "Thursday and Friday overnight and every other weekend." *Appellant's App.* at A048. Father agreed to pay child support to Mother in the amount of $288.46 per week.

When Child was approximately four years old, the parties moved into a home ("family residence") in Newburgh, Indiana, near Evansville, and, for the most part, Child has lived in the family residence continuously since that time, living with one parent or the other at that location after the separation and dissolution. Child has friends in the neighborhood, some of whom have spent

the night at the family residence. Child excels academically at her school and is involved with extra-curricular activities, such as basketball associated with her school and tumbling classes in Newburgh. Child's extended family, on both Mother's and Father's side of the family, live in the Newburgh and southern Indiana area, and Child spends time with these relatives on birthdays, holidays, and other occasions. Child's maternal grandmother, Marilyn O'Neal ("O'Neal"), lives in Evansville. O'Neal and Child enjoy a close and bonded relationship and see each other frequently. O'Neal retired at age fifty-five to be available to take care of Child as needed, and, generally, she has been Child's primary caretaker on those occasions when Mother and Father are not available.

[5] Father works in Evansville and is an independent contractor with FedEx Ground. He owns two companies, S.C. Sapp, Inc. and Sapp, Inc., and a limited liability company, Sapp Diesel, LLC. The two corporations own and operate twenty-three FedEx trucks and nineteen routes, employing more than twenty individuals as staff, mechanics, and drivers; the limited liability company is a real estate holding company and does not generate income. As a business owner, Father has flexibility in managing his work schedule. Generally, he works from 6:30 or 7:00 a.m. to 10:30 a.m. each day at the FedEx terminal and then is on call, in order to handle issues that may arise with having employees and trucks making deliveries. In addition to working at the terminal, Father works six to eight hours per week from his home office on bookkeeping matters. In March 2011, Mother began working as an

independent contractor for State Farm Insurance Company, owning and operating her own agency in Henderson, Kentucky.[1] By all accounts, Mother enjoyed remarkable success in this position and was awarded national honors and awards for her achievements as an agent. Under the terms of the settlement agreement, Father received sole ownership of his three businesses, and Mother received sole ownership of her insurance agency business.

[6] Because of Mother's work schedule, and by agreement of the parties, Father spent additional parenting time with Child beyond that outlined in the settlement agreement. In or around January 2013, prior to the divorce being final in May 2013, Father moved out of the family residence and into a home that he rented from a family friend, Daniel Chancellor ("Chancellor"). On most school days, Father would meet Child as she got off the school bus, and he would keep her at his residence until Mother got home from work about 6:00 p.m. If it was Mother's overnight, she would pick up Child from Father; otherwise, Child would stay overnight with Father. During the summer months, O'Neal would watch Child during the daytime hours, and Father would pick her up between 3:00 and 4:00 p.m. to be with him until Mother picked up Child around 6:00 p.m.

[7] In July 2013, Mother married Garrett Estes ("Garrett"). Garrett owns and operates two State Farm insurance agencies in the Cleveland, Ohio area.

---

[1] Prior to beginning as an agent with State Farm, Mother worked for McDonald's as a General Manager of a location, starting with McDonald's at age sixteen and working her way up to the management position.

Garrett has one son, H., who is the same age as Child. Child has a good relationship with both Garrett and H. Father has not remarried, but has been in a continuous relationship with Lauren Plunkett ("Lauren") since prior to the dissolution. Lauren has two minor sons, J. and L., who are a little younger than Child. Lauren and her sons live with Father in the family residence. Child has a good relationship with Lauren and her sons.

[8] Between July and September 2013, Mother began communicating with her State Farm Sales Leader Tommy Rowland ("Rowland"), who served as a liaison between individual agents and the State Farm corporate body, about the possibility of moving from her agency in Henderson, Kentucky to an agency in northern Ohio. State Farm's term for the relocation process is "migration." *See Appellant's App*. at A080. Mother first conversed with Rowland by phone, and, at some point in the fall of 2013, she submitted an email request to Rowland formally indicating her desire to migrate. The migration process works as follows: An agent submits a request to migrate, and State Farm determines if there is an agency open in the agent's requested geographic region, whether due to an existing agent's retirement or the opening of a new agency. If there is more than one agency available, State Farm presents one of the openings to the agent, and he or she must accept or reject the offer. The agent cannot say, "'Well, that one is too small' or 'I don't like the location of it.' You either take it or you don't[.]" *Id*. at A102. If the agent accepts, he or she must move to the new agency location. If he or she rejects it, the migration process ends as to the pending request to migrate. An agent may, however, subsequently submit

migration request to begin the process again. Mother learned in September or October 2013 about a State Farm agency in North Ridgeville, Ohio, located just outside of Cleveland, which was becoming available due to the agent's retirement.

[9] In November 2013, Mother filed with the trial court a Notice of Intent to Relocate Residence, stating, in part:

> 5. The moving parent's move is expected to take place on or about December 31, 2013. The Mother has remarried and her current husband's job and her job are now located near Avon, Ohio.
>
> 6. The relocation is being made for financial, budgetary, and economic reasons, and is in the best interest of the party's minor children, and is being made due to the legitimate needs of the parties.

*Id*. at A002. In December 2013, Mother moved her possessions out of the family residence and for the most part moved into Garrett's home in Ohio, and Father moved back into the family residence. For those times that Mother was in Indiana after she moved out of the family residence, she stayed at her mother's home in Evansville. On December 30, 2013, Father filed a petition to modify custody of Child, stating that Mother's proposal to relocate with Child to Avon, which is near Cleveland and is approximately 450 miles from Newburgh, Indiana, was not in Child's best interest.

[10] Although Mother was residing, at least in part, in Ohio, she continued to operate her Henderson, Kentucky agency until mid-2014. In May 2014, she signed a contract to assume ownership and operation of an existing State Farm

agency in North Ridgeville, Ohio; Mother ceased to operate the Henderson, Kentucky office on June 1, 2014.

[11] A few weeks later, on June 26 and 30, 2014, the trial court held a hearing on pending matters, namely Mother's request to relocate and Father's request for change of custody. At the hearing, Mother and Father testified, along with: Rowland; O'Neal; Roy Sapp, the paternal grandfather; and Tina Sapp, Father's sister. The trial court also heard testimony from Chancellor, whose home Father rented for a year, Karen Gingerich, who cleaned house for both Mother and Father for a number of years, and Lisa Provost ("Provost"), a licensed counselor located in Evansville, who saw Child on six occasions, following reports received by Father and Mother from school related to isolated and minor behavioral issues.

[12] Prior to the start of testimony, Mother advised the court that she intended to introduce certified medical records reflecting counseling sessions in which Father was involved, some joint marital sessions and other individual sessions, for the purpose of showing admissions Father made during those sessions. The trial court sustained Father's objection, observing that the records predated the parties' dissolution and, further, that Father had a right to cross-examine the individuals who made the entries in the records. *Tr. Vol.* 1 at 7-9. Later, during Father's testimony, Mother again sought to introduce certain of the records, which the trial court again excluded on the basis of hearsay. *Id*. at 175, 178.

[13] During the hearing, Father explained that since he moved back into the family residence in December 2013, Mother spent most of her free time in Ohio with her husband, and to exercise her parenting time, sometimes Mother would fly Child back and forth between Indiana and Ohio, occasionally requiring Child to fly alone and connect flights through Detroit. The travel time to fly was approximately three hours, and to drive was approximately six and a half to seven hours. Father testified that, while Child remained a happy and well-adjusted Child after the dissolution, and that she continued to do well in school, the travel time impacted her ability to participate in weekend activities, such as basketball and tumbling. Mother testified that her current residence, as of June 1, 2014, was in Avon, Ohio with Garrett and his son. Mother testified that while she moved out of the family residence in December 2013, she resided during the week at her mother's home, in Evansville, Indiana, and did not officially move to Avon until June 1. Before Mother's move to Ohio, she and Father both utilized maternal grandmother, O'Neal, to provide summer childcare for Child. After moving to Ohio, Mother hired a college student in the area to provide summer childcare for Child[2] and Garrett's son. Mother testified that because she and Garrett both had flexible work schedules, she did not anticipate regularly needing before-school or after-school care for Child in Ohio.

---

[2] The hearing occurred in June 2014; for that summer, Child spent a portion of her summer break with Mother in Ohio and the remainder with Father in Indiana.

With regard to Mother's relocation to Ohio, Father testified that, since in or around October 2012 when Mother met and began dating Garrett, Father and Mother had been discussing the issue of whether she would want to relocate with Child to the Cleveland area, and Mother "assured [him] that it wasn't going to happen" and that Garrett and his son planned to move to Indiana. *Tr. Vol.* 1 at 74. Father stated, "[S]he was kinda leading me along to believe that [Garrett and his son] were planning on moving down here." *Id*. at 75. However, in June 2013, one month after the dissolution was final, and provided for Mother to have physical custody of Child, Father learned from Child that Mother and Garrett "had been pretty much planning to move to Cleveland at some point." *Id*. Mother testified that she had always been "open and honest" with Father and that she never lied to him about needing to move. *Tr. Vol.* 2 at 41. She explained that, after marrying Garrett, they were "doing the back and forth," splitting time between cities, in an effort to run her Henderson agency and his two Ohio agencies. *Id*. at 43. To bring the family together, she began inquiring with Rowland about options to migrate one place or the other.

Father testified to his opposition to Mother's request to relocate Child to Ohio, expressing concern about the detrimental effect that the move would have on his extended parenting time with Child, with whom he maintained a particularly close relationship, as he saw her almost daily during the school year. He also testified to his concern that her relationships with extended family in the southern Indiana area would suffer, and she would lose touch with them, observing that Child has no family or friends in Ohio other than

Mother, Garrett, and his son. Father also testified to the close relationship Child enjoyed with O'Neal, who was able to watch Child on those occasions when neither parent was available, and who lived just five minutes from the FedEx terminal. He also "strongly opposed" Mother's plan to enroll Child in a parochial school in Ohio, as the parties had agreed not to impose any particular religion on Child and instead let her choose as she matured. *Tr. Vol.* 1 at 104. He also noted that, in Indiana, Child had the benefit of caretakers being family members, such as O'Neal or Lauren, whereas in Ohio Mother had hired a college student to care for Child and Garrett's son as needed.

[16] Mother testified that Child had met friends and neighbors at Mother's Avon residence, and had a wonderful relationship both with Garrett and his son. Mother indicated that if the relocation was granted, Child would attend the same school that H. had attended for the last couple of years, which Mother indicated was an "exceptional" school. *Tr. Vol.* 2 at 61. Mother noted Child's ability to adapt well, based on prior events, and she was showing that same adaptability with regard to moving to Ohio. Mother explained she had a very flexible work schedule and planned to involve Child in extra-curricular activities in which she had expressed interest, such as basketball, tumbling, golf and tennis. Mother opposed Father having primary physical custody of Child, testifying, among other things, to her concern that Father has a sexual addiction and is in denial about it. Father admitted to maintaining an "open" relationship with Lauren, and Mother testified to her concern: "I don't know what she will see. I don't know what she will be exposed to." *Id.* at 76. She

explained that, as a part-time parent, Father still had the opportunity to engage in behaviors in his private time, meaning "an outlet" to do what he wanted when he was not with Child, but that if Child lived with Father on a full-time basis, he would not have the time or ability to go away on weekends to engage in that "lifestyle." *Id*. at 76-77, 108. Mother also expressed her concern with Lauren living in the residence, given that she agrees to the lifestyle and engages in it. Upon cross-examination, Mother conceded that she was aware of the open/swingers lifestyle before the dissolution and participated in it on more than one occasion. In furtherance of her opposition to Father's custody modification request, Mother testified to having concern about Father taking pain medications and testosterone, and she noted he did not always obtain his medications legally. Father reported to the court the medications he was currently taking and the diagnosed conditions associated with them.

[17] Rowland testified that the reason Mother requested a migration to Ohio was "because she had remarried." *Appellant's App*. at A072. He confirmed that no one at State Farm asked Mother to migrate or suggested that she do so; it was her own idea and desire to do so. While Rowland was disappointed that Mother was leaving his market territory because she was "an amazingly successful agent" in Henderson, he had anticipated she would be requesting the migration because of her "new family situation," and he supported and understood that decision. *Id*. at A079, A082. "I just knew that she had remarried and that's where her husband was living, so I kind of anticipated something happening eventually." *Id*. at A082. He further shared, that State

Farm expects its agents to actively manage their agencies "and it's very difficult to do that on a daily basis when you are living that far away from your agency." *Id.* at A084. Rowland explained that, as of the time of the hearing, Mother's Henderson agency had already been filled by a replacement agent, so if she wanted to come back, she would need to stay in Ohio as an active agent and begin the migration process again, which he characterized as "a waiting game," since it may happen in a short time or it could take years. *Id.* at A088; A104 (could be one month or ten years). Mother's initial conversations with Rowland about migration included inquiries about the possibility of Garrett moving to Indiana, but Rowland did not have any direct conversations with Garrett about it as Garrett would need to contact State Farm's Sales Leader in Garrett's own area, and Rowland had no knowledge of whether that had occurred.

[18]   Provost testified that she saw Child on six occasions, after the parents had received reports from school regarding two instances that Child was observed engaging in a certain behavior, which affected only herself and did not involve other students. Provost testified that Child was a bright, articulate, well mannered, reserved girl, and was very cooperative as well. Provost never witnessed Child engage in the behavior that was previously observed by her teacher, and Provost felt the issue was resolved. Provost noted that both parents had a good relationship with Child and that "they've done [] an exceptional job" of leaving Child out of the issue concerning relocation. *Tr. Vol.* 2 at 10. When presented with hypothetical questions regarding her

professional opinion whether someone who with a sexual addiction or an addiction to pornography should have custody, she replied, over Father's objection, that it could put the child at risk of being exposed to sexuality and that a professional should be consulted to evaluate the person and determine if the addictions have been resolved. Provost confirmed that nothing during her counseling sessions with Child indicated that her behavior at school occurred because she had been exposed to something inappropriate.

[19] With regard to income, the evidence revealed that Father receives a $40,000.00 base salary from each of his two corporations, and, in addition, he is compensated by FedEx in a number of ways, including compensation based on number of packages delivered and the number picked up, the distance of the stops from the terminal, and good driving records. Father presented the parties' joint 2012 tax return, reflecting an adjusted gross income of $169,650.00, although according to an attached IRS worksheet, his individual adjusted gross income was $111,955.00, and the parties received a tax savings by filing jointly. *Pet'r's Ex.* J. Father testified that he had requested and received extensions to file his 2013 returns, and thus, tax returns were not available as of the time of the 2014 hearing, but his 2013 W-2s from the two Sapp corporations reflected the same $40,000.00 salary as prior years. Father indicated that over the last five years his income had fluctuated from a high of around $200,000.00 to a low of $113,000.00, and that an annual income of $150,000.00 per year represented a fair estimation and considered annual fluctuations. Father introduced a proposed child support worksheet, reflecting an annual income of $150,000.00

for himself and $130,000.00 for Mother, resulting in a weekly obligation of $107.21 from Mother to him if the trial court granted his request for change of custody of Child. *Pet'r's Ex.* K.

[20] With regard to Mother's income, Rowland testified that State Farm compensates its agents on a commission basis, receiving commission on new business and on renewals, and they receive annual bonuses. In addition, the agents may earn rewards such as vacations and the like; the monetary value of the rewards are included in their gross income for tax purposes, so there is no need to add back those values when determining net income. Mother's 2013 tax return reflected an adjusted gross income of $130,232.00. By moving from her Henderson, Kentucky agency to an agency in North Ridgeville, Ohio, Mother testified that she anticipated her income would be lower in 2014, but was hopeful that it would be higher in 2015. Mother introduced four proposed child support worksheets, which considered variables in Father's income and his visitation, and in all four cases had Mother's income at $130.232.00. Two of the worksheets had Father at an income of $214,547.00, which Mother calculated by taking his approximately $40,000.00 annual salary and adding back to that Schedule E depreciation, expense deductions, and pension; one of those two worksheets assumed 98 overnights for Father and the other assumed 120 overnights for Father. *Resp't's Ex.* 8 and 9. The other two proposed worksheets used $150,000.00 as Father's annual income, again with one worksheet assuming 98 overnights for Father and the other assuming 120 overnights. *Resp't's Ex.* 10 and 11. Mother requested that the trial court

approve her request to relocate Child and adopt her proposed worksheet that had Father's income at $214,547.00, her at $130,232.00, and assumed 120 overnight visitations, resulting in a weekly child support obligation from Father to Mother of $262.26. *Tr. Vol.* 2 at 73; *Resp't's Ex.* 8.

[21] At Father's request, and after both parties had submitted proposed findings of fact and conclusions thereon, the trial court issued its Findings of Fact, Conclusions of Law, and Final Judgment, in which the trial court denied Mother's request to relocate with Child and granted Father's petition to modify physical custody of Child to him.[3] The trial court ordered Mother to pay $107.21 in weekly child support to Father. Mother now appeals.

## Discussion and Decision

## I. Exclusion of Evidence

[22] Mother claims that the trial court erred when, over Father's objection, it did not allow into evidence counseling records and a summary of the records prepared by Mother's counsel, all of which pertained to Father's individual counseling and the parties' marital counseling before the dissolution. Mother argues that such reports and summaries should have been admitted under Indiana Evidence Rule 803(6) and that it was reversible error to exclude the evidence.

---

[3] The trial court entered sixty-six findings of fact and twenty-seven conclusions thereon, and the thoroughness of that order greatly facilitated our review of the issues. We also commend counsel for both parties on their briefing and advocacy in this appeal.

[23] Generally, the admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Apter v. Ross*, 781 N.E.2d 744, 752 (Ind. Ct. App. 2003), *trans. denied*. We will reverse a trial court's decision only for an abuse of discretion, that is, when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.* Moreover, any error in the admission or exclusion of evidence must affect the substantial rights of a party before reversal is appropriate. Ind. Trial Rule 61; Ind. Evidence Rule 103(a). For several reasons, we find no error with the trial court's decision to exclude the evidence.

[24] As the trial court observed, the tendered counseling records all predated the parties' dissolution and settlement agreement, and, generally, evidence that pre-dates a dissolution decree is inadmissible in custody modification cases. Ind. Code § 31-17-2-21(c) (court shall not hear evidence on matter occurring before last custody proceeding between parties unless matter relates to best interest of child as described in Indiana Code section 31-17-2-8). Moreover, the record reflects that Mother did not make an offer of proof as required by Indiana Evidence Rule 103(a)(2), and by failing to make an offer of proof, Mother has waived her claim that the exclusion of the records constituted trial court error. Evid. R. 103(a)(2) (party may claim error in ruling to admit or exclude evidence only if error affects party's substantial right and, if ruling excludes evidence, party informs the court its substance by offer of proof); *Court View Centre, L.L.C. v. Witt*, 753 N.E.2d 75, 85 (Ind. Ct. App. 2001) (failure to make offer of proof results in waiver of asserted evidentiary error).

[25] Regardless of waiver and the pre-dissolution nature of the counseling records, the record before us indicates that the evidence Mother sought to present to the trier of fact through those records was otherwise admitted. According to Mother, she sought to admit the records primarily to introduce certain admissions and disclosures that Father made, particularly about aspects of his sex life. At trial, Mother cross-examined Father about having attended counseling, and she elicited from him admissions he made during those sessions, including his viewing of pornography and the possibility of having a sexual addiction. *Tr. Vol.* 1 at 172-75. Father also testified that he and Lauren have an "open," rather than monogamous, relationship, and with her consent, he sometimes engages in other sexual relationships. In addition to Father's testimony on the matter, Mother also testified that, during marriage counseling, Father admitted that he was addicted to pornography, he wanted her to embrace an "open" marital relationship and attend "swingers" clubs with him, and he might have a sexual addiction. *Tr. Vol.* 2 at 75-76. Thus, while the counseling records that Mother claimed would evidence those admissions were excluded, Father's and Mother's testimonies otherwise presented substantially the same information to the trial court.

[26] An error is harmless if it does not affect the substantial rights of the parties. *Spaulding v. Harris*, 914 N.E.2d 820, 830 (Ind. Ct. App. 2009), *trans. denied*. Where wrongfully excluded testimony is merely cumulative of other evidence presented, its exclusion is harmless error. *Id.*; *Ind. Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1088 (Ind. Ct. App. 1992) (error in

exclusion of evidence is harmless when record discloses excluded evidence was otherwise presented to jury). We have held that, even if an evidentiary decision was an abuse of discretion, we will not reverse if the ruling constituted harmless error. *Spaulding*, 914 N.E.2d at 829-30. Here, where substantially the same information that Mother sought to present through the excluded records was admitted through witness testimony, we find that any error in the exclusion of the counseling records was harmless. Mother has failed to establish that the trial court's decision to exclude the counseling records, and her counsel's summary of them, was an abuse of discretion and affected her substantial rights.

## II. Denial of Relocation and Modification of Custody

[27] Upon Father's request, the trial court made specific findings of fact and conclusions of law in its order modifying custody and preventing Child's relocation. We will not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Ind. Trial Rule 52(A); *D.C. v. J.A.C.*, 977 N.E.2d 951, 953 (Ind. 2012) (quotations omitted). Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous when it is unsupported by the findings and the conclusions entered on those findings. *In re Adoption of H.N.P.G.*, 878 N.E.2d 900, 904 (Ind. Ct. App. 2008), *trans. denied*. An appellate court neither reweighs the evidence nor reassesses witness

credibility, and it views evidence most favorably to the judgment. *D.C.*, 977 N.E.2d at 954.

[28] When a parent files a notice of intent to relocate, the nonrelocating parent may object by moving to modify custody or to prevent the child's relocation. Ind. Code §§ 31-17-2.2-1(b), 31-17-2.2-5(a). When this objection is made, "[t]he relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason." Ind. Code § 31-17-2.2-5(c). If the relocating parent shows good faith and a legitimate reason, "the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child." Ind. Code § 31-17-2.2-5(d).

[29] A court must weigh the following factors in considering a proposed relocation, as set forth in Indiana Code section 31-17-2.2-1(b):

> (1) The distance involved in the proposed change of residence.
>
> (2) The hardship and expense involved for the nonrelocating individual to exercise parenting time or grandparent visitation.
>
> (3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time and grandparent visitation arrangements, including consideration of the financial circumstances of the parties.
>
> (4) Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.
>
> (5) The reasons provided by the:
>
> (A) relocating individual for seeking relocation; and
>
> (B) nonrelocating parent for opposing the relocation of the child.
>
> (6) Other factors affecting the best interest of the child.

*D.C.*, 977 N.E.2d at 954. "Other factors affecting the best interest of the child," referenced in subsection (b)(6), include, among other things: the child's age and sex; the parents' wishes; the child's wishes, with the wishes of children fourteen years or older being given more weight; the child's relationship with parents, siblings, and any other person affecting the child's best interests; and the child's adjustment to home, school, and the community. Ind. Code § 31-17-2-8; *D.C.*, 977 N.E.2d at 954 (citing *Baxendale v. Raich,* 878 N.E.2d 1252, 1257 (Ind. 2008)).[4] When one parent is relocating, it is not necessary for a court to find a substantial change in one of these "other factors" before modifying custody. *D.C.*, 977 N.E.2d at 954.

In *D.C.*, a mother sought to relocate to Tennessee with the child. The trial court found that while the mother met her initial burden of showing legitimate reason and good faith in relocating, the father established that it was not in the child's best interest. *Id.* at 954-55. On appeal, a panel of this court determined that the trial court's best-interest determination was clearly erroneous. *Id.* at 956. Reversing that decision, our Supreme Court took the opportunity to reaffirm "the importance of appellate deference in family law matters[,]" stating:

> Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an

---

[4] Our Supreme Court has instructed, "by implication, the factors set forth for custody determinations and modifications require consideration when determining what other factors may affect the best interest of the child." *Baxendale v. Raich,* 878 N.E.2d 1252, 1257 (Ind. 2008).

extended period of time. Thus enabled to access credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.

[32] *Id*. Our Supreme Court contrasted the trial court's unique position to that of appellate courts, who "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Id.* at 956-57 (citing *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quotations omitted)). Therefore, "[o]n appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal[.]" *Id.* at 957. Accordingly, we will not substitute our own judgment "if any evidence or legitimate inferences support the trial court's judgment." *Id*. As the *D.C*. Court recognized, "'The concern for finality in custody matters reinforces this doctrine.'" *Id*. (quoting *Baxendale*, 878 N.E.2d at 1257-58).

[33] Initially, we note that Mother's brief states that she and Child "live in Evansville" and "are seeking to relocate to Avon, Ohio." *Appellant's Br*. at 3. However, according to Father and the record before us, Mother had already relocated, at the latest on June 1, 2014, and perhaps as early as December 2013, when she moved her belongings out of the family residence. She contracted for the new agency in May 2014, and began officially operating it in June 2014. We recognize, as did the trial court, that due to the retirement of another agent,

Mother was provided with the opportunity to relocate to an existing office in North Ridgeville, Ohio, and assume an existing book of business. In addition, she was promoted from a temporary contract with State Farm to a permanent one, which ensured stability for her. We do not judge Mother's decision to migrate to an agency in northern Ohio, where her husband lives and operates two successful State Farm agencies. Our task is to determine whether the trial court's decision to deny her request to relocate Child and modify custody to Father was clearly erroneous.

[34] Here, the trial court determined that Mother, as the party seeking to relocate, did not satisfy her burden of establishing that her relocation was made for a legitimate purpose or in good faith. *Appellant's App*. at A023. In her November 2013 relocation Notice, Mother stated that "her job [was] now located near Avon, Ohio." *Id*. at A001-003. However, as the trial court recognized in its findings, when Mother made that statement in the Notice, her job was not in Ohio as stated, but rather was still in Henderson, Kentucky, through June 2014. Further, the trial court in Finding No. 17 observed:

> Although the Court has not yet ruled on whether to grant the relocation of the minor daughter with the Mother to northern Ohio, the Mother nevertheless agreed to and fully committed herself to the new agency in North Ridgeville, Ohio.

[35] *Id*. at A010. The trial court's conclusions likewise indicated that in the trial court's view Mother had unilaterally sought and completed relocation prior to the trial court's ruling on her request to relocate Child. Its conclusions included:

72. Mother testified that one of her primary reasons for relocating is her employment, as she is now employed with a State Farm agency in North Ridgeville. However, the Court weighs this fact against Mother because she unnecessarily changed her employment after notifying Father of her intent to relocate. Mother testified that State Farm did not require her to migrate. She initiated the inquiry into migrating, and she ultimately made the choice to leave her Henderson office of her own volition. To some extent, it seems that Mother attempted to create another reason to support her relocation request by taking a new job. Parents cannot unilaterally create circumstances that bolster their request to relocate their minor child. Moreover, Mother was gainfully employed and enjoying notable success at her Henderson office. There was no evidence to suggest that her success at the branch would not continue. Furthermore, Mother did not migrate to the North Ridgeville office in hopes of earning a larger salary. In fact, Mother testified that she expected her income to decrease, at least temporarily, after migrating because she will have to create a new "book of business."

73. Mother also testified that she moved to Avon because she wanted to be with her husband, Mr. Estes, who is employed with State Farm in the Avon area. However, having Mr. Estes migrate to an agency in or around Newburgh was a viable option. Additionally, Mr. Estes could have moved to Newburgh and attempted to work at his Ohio offices remotely. The Court is not convinced that Mother and Mr. Estes adequately explored these possibilities.

74. For these reasons, Mother has not satisfied her burden of showing that her proposed relocation of the minor child is made in good faith and for a legitimate purpose.

*Id.* at A022-023. The trial court thereafter reviewed and reached conclusions on statutory factors related to the best interest of the child, *id.* at A025-A030, and determined that it was not in Child's best interest to relocate to Ohio. *Id.* at A030.

[36] Mother argues that she met the statutory burden to establish the good faith and legitimacy requirements of Indiana Code section 31-17-2.2-5(c), given that

relocating to Ohio to run her own agency, already established with a set of business and under a permanent State Farm contract, will strengthen her family's financial situation, including Child's and, in addition, will unite Mother with her husband. In *H.H. v. A.A.*, 3 N.E.3d 30, 35 (Ind. Ct. App. 2014), our colleagues observed that "case law has not explicitly set forth the meaning of legitimate and good faith reasons in the relocation context." The *H.H.* court recognized, however, that "'it is common in our society that people move to live near family members, for financial reasons, or to obtain or maintain employment,'" and it adopted the reasoning that "these and similar reasons are what the legislature intended in requiring that relocation be for 'legitimate' and 'good faith' reasons." *Id.* (quoting *T.L. v. J.L.*, 950 N.E.2d 779, 787-88 (Ind. Ct. App. 2011). Assuming without deciding that Mother is correct that the trial court erred when it determined that she did not meet the legitimate reason and good faith requirements of the statute, we must still determine whether the trial court erred when it determined that Father met his burden of establishing that it was not in Child's best interest to relocate to Ohio. *See H.H.*, 3 N.E.3d at 35 (resolution of relocation disputes ultimately turns on judicial determination of best interest of child); *T.L.*, 950 N.E.2d at 788 (same). To make its determination, the trial court in this case needed to consider, among other things, the child's age and sex; the parents' wishes; the child's wishes, with the wishes of children fourteen years or older being given more weight; the child's relationship with parents, siblings, and any other person affecting the child's best interests; and the child's adjustment to home, school, and the community. Ind. Code §§ 31-17-2.2-5(d), 31-17-2-8.

[37] Here, the trial court conducted a two-day evidentiary hearing and heard the testimony of nine witnesses. The trial court heard the testimony that Child attends, and excels, at her elementary school, participates in local extra-curricular activities and sports both in and out of school, has a stable home life, and has formed friendships with friends and neighbors. All of her extended family, on both sides of the family, live in the southern Indiana area. She and O'Neal have a close and bonded relationship, with O'Neal often providing any needed childcare. Child enjoys periodic social outings with Father's sister, and she celebrates holidays and birthdays with grandparents and other extended family. Father testified to his concern that those relationships will deteriorate if Child were relocated to Ohio. Father testified to exercising regular, many times daily, visitation with Child. Witnesses testified that both Mother and Father were good parents and had a loving and appropriate relationship with Child.

[38] In her appeal, Mother argues that the trial court failed to consider aspects of Father's sex life and how they could impact Child if she were in his care full-time and about his medication habits. Mother also notes that, if the relocation were granted, Father testified that he would have the ability to exercise 98 to 120 overnights per year and that he acknowledged the ability to purchase another home in the Avon, Ohio area so that he could exercise at least one weekend per month with Child. The trial court heard, evaluated, and considered all of these matters. The trial court was skeptical of Mother's concerns regarding Father's private sex life, and it found that none of the medical conditions or prescriptions have been shown to affect Father's care for

Child. *Appellant's App.* at A018-19. Mother is asking us to reweigh the evidence which we cannot do. *In re Marriage of Harpenau*, 17 N.E.3d 342, 348 (Ind. Ct. App. 2014).

The trial court's findings and conclusions indicate that it was troubled that Mother decided to accept and begin new employment regardless of the fact that no hearing had yet been held, as "[I]t signals to the Court that Mother has placed her own interests ahead of [Child's]." *Appellant's App.* at A029. The trial court heard the testimony and examined the evidence, ultimately finding that a relocation to Ohio would be contrary to Child's best interest and that a change of custody was warranted. "It is not enough that the evidence might support another conclusion; it must positively require the conclusion advocated by the appellant in order for us to reverse." *Harpenau*, 17 N.E.3d at 348. Based on the record before us, and consistent with the applicable clear-error standard of review, we cannot say that there were no facts, either directly or by inference, to support the trial court's decision.

## III. Child Support

Having found that the trial court's decision to deny relocation and modify primary physical custody was not clearly erroneous, we turn to Mother's claim that the trial court abused its discretion when it ordered Mother to pay Father child support in the amount of $107.21 per week. In reviewing a trial court's modification of child support, we reverse only for an abuse of discretion. *Id.* at 349. An abuse of discretion occurs when the decision is against the logic and

effect of the facts and circumstances before the court, including any reasonable inferences. *Id.*

[41] Mother contends that the trial court abused its discretion when in calculating child support it used an annual income figure of $150,000.00. She proposed that the trial court utilize an annual income for Father of $214,547.00, arguing, "The Father's income should be calculated by considering his expense deduction, his depreciation, and his investment tax credits." *Appellant's Br*. at 31. Mother provides no support, however, for the proposition that the trial court was required to add to Father's salary depreciation, expense deduction, and pension. In fact, she reminds us that "the trial court is vested with discretion regarding the validity of business expenses and deductions taken for tax purposes by a business owner." *Id*. at 30 (quoting *Bass v. Bass*, 779 N.E.2d 582, 593 (Ind. Ct. App. 2002), *trans. denied*). Mother also asserts that child support was computed improperly, and warrants remand for recalculation, because the trial court employed 2013 income figures for Mother and 2012 income figures for Father, placing Mother "in a detrimental position" by using a higher figure for her and a lower figure for Father. *Appellant's Br*. at 32. Based on the record before us, Mother has not established that she was placed in a detrimental position, or that the trial court abused its discretion, when it calculated child support.

[42] Here, the trial court received testimony from Father regarding his income, as well as documentary evidence, including W-2s, K-1s, tax returns, and 1099s for several years. The trial court recognized that both parties are self-employed

independent contractors, whose income fluctuates and is dependent on variables and that, consequently, there is difficulty in calculating income for self-employed individuals. *Appellant's App*. at A020. Taking into consideration the evidence before it, the trial determined that Father's proposed child support worksheet was "reliable" and represented an accurate assessment of the parties' incomes for purposes of determining child support. *Id*. The trial court calculated child support based on annual incomes of $150,000.00 for Father and $130,000.00 for Mother. The record before us reveals that there was evidence to support this decision. Mother has failed to establish that the trial court abused its discretion in its child support calculation.[5]

[43] Affirmed.

Vaidik, C.J., and Bradford, J., concur.

---

[5] We also note, and as Father reminds us, Mother submitted at trial proposed alternate child support obligation worksheets that identified Father's annual income at $150,000.00, which is the annual income figure ultimately employed by the trial court. *Resp't's Ex.* 10 and 11. We recognize that Mother requested the trial court to adopt a different proposed worksheet, but she nevertheless offered and the trial court admitted into evidence two worksheets with Father's income at $150.000.00. To some extent, then, she invited the trial court to utilize this income figure, which, even if it does not rise to the level of waiver, at a minimum supports our determination that the trial court did not abuse its discretion.