**Stephanie Joy LEISURE,**
**Appellant–Petitioner,**

v.

**William Thomas WHEELER,**
**Appellee–Respondent.**

No. 49A02–0411–CV–918.

Court of Appeals of Indiana.

June 1, 2005.

Steven Sams, Indianapolis, IN, Attorney for Appellant.

Monty K. Woolsey, Miroff, Cross & Woolsey, Indianapolis, IN, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Stephanie Joy Leisure ("Mother") appeals the trial court's denial of her petition to modify custody and failure to rule on her petition to modify child support. We find that Mother did not carry her burden of establishing that there was a substantial change in circumstances that necessitated a modification of custody and that it was in the best interests of her child to modify the existing custody arrangement. Consequently, we affirm the trial court's denial of Mother's petition for modification of custody. Because the child support order that Mother seeks to modify was based on two children and one child has since died, we remand the case to the trial court for a determination of Mother's child support obligation.

### Facts and Procedural History

Mother and William Thomas Wheeler ("Father") divorced in May 1998. Custody of the couple's two minor children, R.W.—born September 22, 1994—and N.W.—born December 12, 1996—was initially awarded solely to Mother, and Father was permitted parenting time.[1] Additionally,

---

1. The dissolution proceedings and initial custody and support determinations were made in the Bartholomew County Court system. Subsequently, the case was transferred to the Marion County Court system, and it is from a

the court ordered Father to pay child support in the amount of $157 per week for the two children.

In January 2001, the court issued an Agreed Order establishing that Mother and Father would share joint custody of the children. Under this arrangement, the children were to reside with Father, but Mother was to have "liberal possession of the children as can be agreed between the parties." Appellant's App. p. 12. The Agreed Order also specified that Father was current on child support, that his obligation under the court's previous order would terminate, and that the parties would "not be required to pay child support to the other until further order of the court." *Id.*

In August 2003, the court ordered Mother to pay $40 per week in child support. The order provided, however, that this amount would abate 50% during all full weeks when she has the children for regular parenting time. Additionally, the order specified:

> Mother shall not be the regular child care provider for the minor children, but Father shall allow Mother the right of first refusal whenever he needs a babysitter. Father's only obligation in this regard is to try and contact Mother to ask if she wishes to babysit the minor children.

*Id.* at 16. Finally, the order transferred the case to Marion County because both parties now resided in that county. Mother failed to follow the Bartholomew County court's order regarding the payment of child support. In December 2003, she was found in contempt and ordered to serve thirty days in jail, which the court suspended on the condition that she make regular child support payments of $40 plus arrearage payments of $20.

Marion County Court Order that Mother appeals.

Because Mother again failed to comply with a court order requiring her to pay child support and because Mother refused to return N.W. to Father at the end of her parenting time weekend, Father filed a Motion for Rule to Show Cause in Marion Superior Court. In that motion, Father brought to the attention of the court that R.W. died on February 16, 2004, by means of accidental drowning. R.W. was in Mother's care at the time of his accidental death. While Father's motion was pending, Mother filed a Verified Petition for Modification of Custody and Child Support. The trial court held a hearing on both motions in August 2004.

At the hearing, Mother alleged that Father was abusive toward R.W. and N.W. In support of this allegation, Mother testified about a painting R.W. had given her for Valentine's Day 2003, on the back of which was scrawled, "[H]elp mommy help my dad is abouising [sic] me[.] I need help my butt hurts mom use it in cort [sic]! Mom dad spanked [sic] me and it hurts very much!!!!!!" *Id.* at 68. She also testified that she observed a red mark on N.W.'s forehead and an egg-like swelling on the top of his scalp and that N.W. told her that Father's mother had punched him in the head. A month after Mother made these observations, N.W. began complaining about headaches, blurred vision, and dizziness, so Mother scheduled a doctor's appointment for N.W. Mother testified that Father failed to take N.W. to the appointment. Mother also complained that Father would tape record or listen in on her telephone conversations with N.W., that Father allowed other people to care for N.W. after school instead of allowing her to do so, and that Father denied her parenting time on many occasions. Additionally, Mother's mother testified that Fa-

ther told N.W. that his mother was going to jail.

Mother submitted two Child Support Obligation Worksheets to the trial court. The first worksheet calculated Father's child support obligation to be $150.60 per week if she were to be granted custody of N.W. This calculation was made using pay periods during which Father was paid overtime wages. The second worksheet calculated Mother's child support weekly obligation at -$14.15 if the trial court permitted Father to retain custody of N.W.[2]

Father testified that N.W. is doing well in school; specifically, Father highlighted that N.W. received all A's and B's on his most recent report card and that there have been no reports of behavioral problems. As to Mother's allegations of abuse, Father admitted that he had disciplined his step-daughter with a belt on one occasion in 1996, but he reported that he rarely spanks his children. Father also testified that Mother has raised numerous complaints of abuse by Father with Child Protective Services, but each complaint has been deemed unsubstantiated. Father noted that the allegations of abuse usually coincided with his efforts to collect child support. Additionally, during the hearing Father raised concerns about the level of supervision and the home environment Mother provides. These concerns stemmed from R.W.'s drowning while in Mother's care and the amount of smoking and alcohol consumption in Mother's home.

Eulalio DeLeon and Brenda McGinley, two employees of an investigative firm hired by Father, also testified. DeLeon testified, over Mother's objection, that he had collected the garbage from Mother's residence for two consecutive weeks and found it to contain several empty alcohol bottles and packs of cigarettes, rolling pa-

pers, what appeared to be a stem from a marijuana plant, fast food wrappers, and frozen dinner packages. McGinley testified regarding a report she prepared, which indicated neither Mother nor her current husband has a valid driver's license and that Mother's current husband has a criminal record that includes felony convictions for burglary and theft and charges of possession of marijuana and hash. Mother objected to the admission of the report.

The trial court denied Mother's petition to modify custody, found Mother in contempt of court, and sentenced Mother to ninety days in the Marion County Jail on the contempt finding with execution to be held in abeyance until further order of the court. The trial court's August 4, 2004, Order contained no ruling on Mother's petition to modify child support. Mother filed a motion to correct errors, in which she challenged the trial court's denial of her petition for modification of custody and the lack of a ruling on her request for modification of child support. The trial court denied the motion to correct errors, and Mother now appeals.

### Discussion and Decision

Mother contends that the trial court erred by denying her petition for modification of custody and by failing to rule on her petition for modification of her child support obligation. As to her motion for modification of custody, Mother maintains that there was a substantial change in three of the statutory factors considered when modifying custody and that it was in N.W.'s best interests for custody to be modified. Mother also asserts that the trial court erroneously admitted evidence of items found in her garbage and her current husband's criminal history.

2. We note that child support obligations properly calculated under the child support guide- lines should never result in a negative number.

## I. Modification of Custody

In general, we review custody modifications for abuse of discretion, with a "preference for granting latitude and deference to our trial judges in family law matters." *Apter v. Ross,* 781 N.E.2d 744, 757 (Ind.Ct.App.2003) (quoting *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind.2002)), *trans. denied.* When reviewing a trial court's determination to modify custody, we may not reweigh the evidence or judge the credibility of the witnesses. *Rea v. Shroyer,* 797 N.E.2d 1178, 1181 (Ind.Ct. App.2003). Rather, we consider only the evidence most favorable to the judgment and any reasonable inferences from that evidence. *Id.*

In the initial custody determination, both parents are presumed equally entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating that the existing custody arrangement should be altered. *Apter,* 781 N.E.2d at 757–58. A court may not modify a child custody order unless (1) the modification is in the best interests of the child; and (2) there is a substantial change in one or more of the factors a court may consider under Indiana Code § 31–17–2–8 when it originally determines custody. *See* Ind.Code § 31–17–2–21. The factors listed in section 8 are as follows:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian. . . .

Ind.Code § 31–17–2–8.

### A. Substantial Change in Statutory Factors

Mother claims that there was a substantial change in at least three of the statutory factors delineated at Indiana Code § 31–17–2–8. Specifically, she alleges that Father interfered with her relationship with N.W.; that N.W.'s physical health had changed; and that there was evidence of a pattern of domestic or family violence by Father and Father's mother. We address each allegation in turn.

### 1. Interference with the Child's Interaction and Interrelationship with Mother

Mother asserts that Father interfered with her interaction and interrelationship with N.W. by telling N.W. that Mother was going to jail, by taping telephone conversations between Mother and N.W., and by denying her parenting time opportunities.

### a. Communications

As to the communications issues raised by Mother, we turn to the Parenting Time Guidelines. The General Rules Applicable to Parenting Time set forth some guidelines for communications with a child both generally and by telephone:

**With A Child Generally.** A child and a parent shall be entitled to private com-

munications without interference from the other parent. A child shall never be used by one parent to spy or report on the other. Each parent shall encourage the child to respect and love the other parent. Parents shall at all times avoid speaking negatively about each other in or near the presence of the child, and they shall firmly discourage such conduct by relatives or friends.

**With A Child By Telephone.** Both parents shall have reasonable phone access to their child at all times. Telephone communication with the child by either parent to the residence where the child is located shall be conducted at reasonable hours, shall be of reasonable duration, and at reasonable intervals, without interference from the other parent.

Ind. Parenting Time Guidelines § I(A)(2)-(3). The Commentary to Section I(A) explains:

> Examples of unacceptable interference with communication include a parent refusing to answer a phone or refusing to allow the child or others to answer; a parent recording phone conversations between the other parent and the child; turning off the phone or using a call blocking mechanism or otherwise denying the other parent telephone contact with the child.

The general communications guideline indicates that parents should refrain from speaking negatively about each other in the presence of the child. Father denied the uncorroborated accusation that he told N.W. that his mother was going to jail. We will not reweigh the evidence.

More problematic is Father's taping of telephone conversations between Mother and N.W. Father admitted during the hearing that he taped some of the telephone conversations between Mother and N.W. Father claims, "custodial parents have the right to record the telephone conversations involving their child as a means of assuring the child's welfare and safety." Appellant's App. p. 11. In support of this proposition, Father directs our attention to this Court's *Apter* decision.

*Apter* appealed the trial court's order modifying custody of his two children solely to their mother, Ross. During the modification hearing, Apter sought to introduce a transcript of a recorded telephone conversation between Ross and his daughter. Apter testified that he made the recording due to his concern for the welfare of his daughter. The trial court refused to admit the transcript because it found that the recording violated federal wiretap laws. Consequently, Apter raised the trial court's exclusion of this evidence as one of his grounds of error on appeal.

Relying on a Seventh Circuit case, *Scheib v. Grant*, 22 F.3d 149, 154–55 (7th Cir.1994), we stated, "A parent's concern for a child's well-being must be the purpose in taping the phone conversation.... [I]t is a parent's motivation and not the child's actual well-being that is important in determining this issue." *Apter*, 781 N.E.2d at 754. Because Apter had established that his motivation in taping the telephone conversation was a concern for his daughter's well-being, we found no violation of the Federal Wiretap Act. *Id.* at 755. Moreover, we found that Apter's tape recording of the conversation did not violate Indiana's Wiretap Act because a parent has the power to consent on behalf of his or her minor child to the recording of that child's phone conversation unless otherwise curtailed in some legal proceeding. *Id.* at 756.

■ Father is correct that we have previously held that a parent can consent on behalf of his minor child to the recording of a telephone conversation where the re-

cording is motivated by a genuine concern for the welfare of a child. However, the trial court, if it finds the recording was not done for the well-being of the child but instead as a way to interfere with the other parent's relationship with the child, may consider this as a factor in modifying custody. As the Parenting Time Guidelines indicate, children should generally be able to engage in telephone conversations with a parent without the other parent recording those conversations. Nonetheless, we cannot say that the trial court erred by concluding that Father's taping of the telephone conversation does not establish a substantial change necessitating a modification of custody.

### b. Denial of Parenting Time Opportunities

■ Mother additionally maintains that Father denied her parenting time opportunities. In particular, she claims that Father had other people care for N.W. after school instead of allowing her to do so and that he interfered with her extended parenting time. The Parenting Time Guidelines discuss the opportunity for additional parenting time by allowing the non-custodial parent the right of first refusal to provide child care:

**Opportunity for Additional Parenting Time.** When it becomes necessary that a child be cared for by a person other than a parent or a family member, the parent needing the child care shall first offer the other parent the opportunity for additional parenting time. The other parent is under no obligation to provide the child care. If the other parent elects to provide this care, it shall be done at no cost.

Ind. Parenting Time Guideline § I(C)(3). The Commentary to this subsection explains:

The rule providing for opportunities for additional parenting time promotes the concept that a child receives greater benefit from being with a parent rather than a child care provider. It is also intended to be practical. When a parent's work schedule or other regular recurring activities require hiring a child care provider, the other parent should be given the opportunity to provide the care. Distance, transportation or time may make the rule impractical. Parents should agree on the amount of child care time and the circumstances that require the offer be made.

At the hearing, Father explained that his mother did care for N.W. but that it was for less than three hours each time. As highlighted in the commentary to Parenting Time Guideline § I(C)(3), the guideline is intended to be practical. We cannot say the trial court erred by not modifying custody on this basis. Additionally, while Mother complained that she had not exercised extended parenting time during the past year, Mother failed to establish that Father had denied her any extended parenting time.

### 2. Changes in the Child's Physical Health

■ Mother also alleges that there have been changes in N.W.'s health that necessitated a modification of custody. The evidence presented regarding N.W.'s physical health was that he had some bumps and bruises and complained of headaches, dizziness, and blurred vision. After N.W. made these complaints, Mother scheduled a doctor's appointment for him, to which Father failed to take N.W. We cannot say that trial court erred by determining that evidence of an isolated complaint of symptoms and a single instance of missing a doctor's appointment did not demonstrate a substantial change in N.W.'s health, which merited a modification of custody.

### 3. Evidence of a Pattern of Domestic Violence

▮▮▮ Mother next argues that there was evidence of a pattern of domestic abuse. Specifically, she claims that Father and his mother were both abusive. To support her allegation that Father was abusive, Mother offered into evidence a note allegedly written by R.W. before his death that Father abused him and spanked him[3] and testified that he had used a belt to discipline his step-daughter in 1996. Father explained at trial that Mother had lodged several complaints with Child Protective Services, usually coinciding with his attempts to collect child support from Mother. None of these complaints were substantiated. Father, however, admitted to using a belt to discipline his children on rare occasions. Nonetheless, Mother's allegations plus Father's admission failed to persuade the trial court that a modification in the custody arrangement was warranted. We will not reweigh the evidence.

Additionally, the trial court was apparently unpersuaded that N.W.'s relationship with Father's mother was characterized by violence. Mother testified that on one occasion she observed a red mark on N.W.'s forehead and an egg-like swelling on his scalp. Mother, however, provided no competent evidence that Father's mother caused the injuries. Mother has failed to establish a pattern of domestic violence.

Given all the circumstances in this case, we cannot say that the trial court erred by determining that there was no substantial change in circumstances.

### B. Best Interests of the Child

In addition to whether there has been a substantial change in one or more of the considerations listed in Indiana Code § 31–17–2–8, the trial court must also consider the best interests of the child when deciding whether to modify an existing custody arrangement. In an effort to controvert Mother's assertion that the existing custody arrangement should be modified and to establish that it was in N.W.'s best interests to remain in his care, Father presented evidence regarding the types of items found in Mother's trash and her current husband's criminal record. Mother claims that this evidence was erroneously admitted.

### 1. Admission of Evidence

▮▮▮ Generally, the admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Apter*, 781 N.E.2d at 752. We will reverse a trial court's decision only for an abuse of discretion, that is, when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.*

### a. "Garbology"

▮▮▮ DeLeon, an investigator hired by Father, gathered garbage from Mother's home for two consecutive weeks, inventoried the contents, and then testified about what he found during the hearing below. Mother objected to DeLeon's testimony on the basis that he was testifying as an expert without a proper foundation. The

---

3. Father identifies this note as hearsay in his appellate brief, and we agree. Father, however, did not object to this exhibit on hearsay grounds during the proceedings below. It is well settled that a party may not object on one ground at trial and rely on a different ground on appeal. *West v. State*, 755 N.E.2d 173, 187 n. 3 (Ind.2001). Moreover, we note that "[t]he harm arising from evidentiary error is lessened if not totally annulled when the trial is by the court sitting without a jury. The trial judge is presumed to know the intricacies of the rules of evidence and to consider the evidence in that light, ignoring the extraneous, incompetent, and irrelevant." *D.H. v. J.H.*, 418 N.E.2d 286, 294 (Ind.Ct.App.1981) (internal citations omitted).

trial court permitted DeLeon to testify over Mother's objection.

Indiana Evidence Rule 702 provides that expert opinion is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable. Mother maintains that the scientific principles underlying "garbology"[4] are not reliable. We need not reach this issue because although DeLeon classified himself as an expert, his testimony was not opinion testimony.

DeLeon testified that he found certain items in the garbage he retrieved from Mother's home. Specifically, DeLeon reported that during each of the two separate garbage retrievals he found five bottles of Seagram's 7, eleven packs of Virginia Slims cigarettes, five or six packs of Camel filter cigarettes, and fast-food containers, among the other items in the garbage. He also testified that he recovered Zig Zag rolling papers and a plant stem that he believed was marijuana. DeLeon explicitly testified that he was not telling the trial court how Mother and her current husband lived:

A: It just shows that people eat out a lot. That's all I said. I'm not telling you how they live. I'm just telling you that when I see a lot of fast food, it gives me reason to assume that these people eat out a lot.

Q: But you are telling us how they live. You're telling us they consume alcohol, they smoke cigarettes, they don't cook home-cooked meals. Isn't that how they live?

A: I'm not telling you what their home is. I'm not in their home watching them. This is what I get from their inventory ... from their garbage. I can't tell you exactly what I saw

them physically drink. I can't tell you that I saw them doing these ... this is what I found in their garbage.

Tr. p. 40–41.

We will not place our imprimatur on this type of investigative work. But the issue before us is not whether we accept garbology as good practice. Rather, the issue we are asked to address is whether this was expert opinion testimony that required a proper foundation before being admitted. In light of the fact that DeLeon merely testified regarding what he found in the garbage and took strides to explain that he was simply reporting what he found, we find that he did not offer opinion testimony. We cannot say that the trial court erred by permitting DeLeon to testify over Mother's objection.

### b. Step-father's Criminal History

 McGinley, another employee with the investigative firm hired by Father, testified that she researched Mother's current husband's criminal history and discovered that he had felony convictions for burglary and theft and that he had been charged with possession of marijuana and hash. Mother contends that admission of her current husband's criminal history violated Indiana Evidence Rule 404(b).

Indiana Evidence Rule 404 precludes the admission of character evidence in order to show action in conformity therewith except under certain delineated exceptions. Mother's current husband's prior arrests and convictions, however, were not being admitted for the purpose of showing action in conformity therewith. Stated otherwise, Mother's current husband's criminal history was not being admitted to show that he stole or used drugs on another occasion. Rather, this evidence speaks to

---

4. DeLeon testified that "garbology" is the study of trash. Tr. p. 29.

Mother's current husband's fitness to care for N.W.

If a person's character is an issue in the case, character evidence has independent relevance and is not offered for the prohibited purpose of showing conforming conduct. 12 Robert Lowell Miller, Jr., *Indiana Practice* § 404.103, at 339 (2d ed.1995). We have previously said that a person's character may be a material fact in deciding who should have custody of children as fitness to provide care is of paramount importance. *In re J.L.V., Jr.,* 667 N.E.2d 186, 190 (Ind.Ct.App.1996) (finding that Indiana Rule of Evidence 405(b) applies when a person's character is a material fact that determines the parties' rights and liabilities under the substantive law); *see* IA John Henry Wigmore, *Wigmore on Evidence* § 69.1, at 1457 (Tillers rev. 1983) ("[T]he right of a parent to retain custody of a child may depend on a finding of the fitness of that person as a parent. In these cases, character evidence is of course admissible since what is at issue in the case *is* a character trait, and if the issue to be resolved on the basis of evidence, evidence of character must be admitted."). When character has been put in issue by the pleadings as typically occurs in child custody cases, evidence of character must be brought forth. *See id.* This conclusion is consistent with our common law, which has provided that in civil cases character evidence will be admissible if the nature of the underlying action places a person's character at issue. *See Niemeyer v. McCarty,* 221 Ind. 688, 51 N.E.2d 365 (1943) (quoting *Gebhart v. Burkett,* 57 Ind. 378, 380 (1877)), *overruled on other grounds, Ashton v. Anderson,* 258 Ind. 51, 279 N.E.2d 210 (1972); *Peoples Trust & Savings Co. v. Cohen,* 117 Ind. App. 472, 73 N.E.2d 366 (1947).

Indiana Rule of Evidence 405 sets forth the methods for proving character. Relevant to this case, Rule 405(b) states:

> (b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Here, Mother's current husband's character is a material issue in the case because if custody were to be modified, then he would be living in the same household as N.W. and helping to raise him. Therefore, we cannot say that the trial court erred by admitting evidence of Mother's current husband's criminal history.

## II. Modification of Child Support

██ Finally, Mother asks us to adopt either of the two Child Support Obligation Worksheets she submitted to the trial court or to remand this matter "with instructions to the trial court to set forth the basis of a new award consistent with the facts before the trial court." Appellant's Br. p. 13. Here, the trial court's Order is silent regarding Mother's request for modification of her child support obligation. The Bartholomew County court had previously set Mother's child support obligation at $40 per week. This amount, however, was set at a time when both children were still alive. R.W. died before Mother petitioned the trial court for modification of her child support obligation.

During the hearing, Father submitted a financial declaration, which indicated his gross weekly income was $1020.40.[5] He admitted that he works overtime, but he also testified that the amount of overtime he works varies and that sometimes he does not work overtime. The two Child Support Obligation Worksheets submitted

---

5. Based on our review of Father's pay stubs included in the record, this figure does not take into account any of the overtime worked by Father.

by Mother used a figure for his gross weekly income derived by looking at four pay periods during which Father was paid overtime. *See* Ind. Child Support Guideline 3(A), cmt. 1(b) (discussing complexity in determining how overtime pay should be factored into weekly gross income).

Because one of the couple's two children died since Mother's child support obligation was last assessed and in light of the dispute regarding how to calculate Father's income because of issues with overtime pay, we remand to the trial court for a determination of whether Mother's support obligation should be modified. *See* *Nill v. Martin,* 686 N.E.2d 116, 119 (Ind. 1997) (Boehm, J., dissenting) ("Death of a child, like emancipation, is plainly a legitimate reason to adjust an in gross support order by some amount.").

Affirmed in part and remanded in part.

SHARPNACK, J., and MAY, J., concur.