



FILED

Apr 10 2025, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Alaina B. (Smith) Tandy,

*Appellant-Petitioner*

v.

Tyler M. Smith,

*Appellee-Respondent*

---

April 10, 2025

Court of Appeals Case No.
24A-DC-1993

Appeal from the Jefferson Circuit Court

The Honorable Donald J. Mote, Judge

Trial Court Cause No.
39C01-1705-DC-475

---

**Opinion by Judge Pyle**
Judges Bradford and Kenworthy concur.

**Pyle, Judge.**

## Statement of the Case

Alaina Tandy ("Mother") appeals the trial court's order that modified custody of the parties' nine-year-old twin sons ("the children") in favor of Tyler Smith ("Father"). She argues that the trial court abused its discretion when it modified custody of the children in favor of Father. Concluding that the trial court did not abuse its discretion, we affirm the trial court's judgment.

We affirm.

## Issue

> Whether the trial court abused its discretion when it modified custody of the children in favor of Father.

## Facts

Mother and Father (collectively "Parents") were married in May 2014. The children were born in May 2015. Parents separated in January 2017, and, in March 2017, Mother filed a petition for custody and child support. In May 2017, the trial court issued an order granting Mother custody of the two-year-old children and awarding Father parenting time. Later in May 2017, Mother filed a dissolution petition.

In October 2018, Father filed a petition asking the trial court to hold Mother in contempt because she had failed to comply with the parenting time order. One

week later, Mother filed an emergency petition to suspend Father's parenting time. In this petition, Mother alleged that Father had physically assaulted one of the children. Mother also apparently reported the allegation to the Department of Child Services ("DCS"). Two days later, Father filed a petition to modify custody wherein he alleged that Mother had denied him parenting time with the children. In this petition, Father also alleged that Mother had accused him of child abuse and that DCS had found that Mother's abuse allegation was unsubstantiated.

[5] The trial court held a hearing on the petitions in February 2019. At that time, Mother lived with her parents ("maternal grandparents") in Indiana, and Father had moved to Alabama, where he lived with his parents ("paternal grandparents") and worked. At the hearing, a DCS family case manager testified that the injury to one of the children did not appear to have been inflicted.

[6] In March 2019, the trial court issued an order denying Mother's motion to suspend Father's parenting time. The trial court further ordered that parenting time should continue under the May 2017 parenting time order and that one of Mother's family members should participate in parenting time exchanges. The trial court also denied Father's petition for contempt and his motion to modify.

[7] Three months later, in June 2019, Parents entered into a property settlement, child custody, parenting time, and child support agreement. Specifically, Parents agreed that Mother would have custody of the four-year-old children

and that Father would have parenting time consistent with the Indiana Parenting Time Guidelines. Also, in June 2019, the trial court entered an order dissolving Parents' marriage.

[8] Following the dissolution of the marriage, Father, a mechanical engineer, remained in Alabama but purchased a home in Indiana so that he would have a place to take the children during his parenting time. In addition, Father made the seven-hour drive from Alabama to Indiana every other weekend to exercise his parenting time with the children. Father also drove to Indiana when he did not have parenting time to attend the children's activities, such as basketball games, kindergarten graduation, and Christmas programs.

[9] At some point, Father noticed that Mother, maternal grandfather ("maternal grandfather"), and/or maternal grandmother ("maternal grandmother") were following him during his parenting time with the children. In addition, Father noticed that maternal grandparents would often show up at locations where Father had taken the children. For example, on one occasion, Father noticed that maternal grandmother was driving around a restaurant where he and the children were eating. On another occasion, Father noticed maternal grandparents at a drugstore where he and the children were shopping. Further, on multiple occasions, Father noticed maternal grandfather drive by an outdoor basketball court where Father and the children were playing.

[10] In addition, maternal grandfather twice physically confronted Father. Specifically, on one occasion, as Father was leaving the children's basketball

game, maternal grandfather followed Father to his car, grabbed Father's arm, grabbed Father's car door, kicked the fender of Father's car, and stood in front of Father's car. Father had to drive around maternal grandfather to exit the parking lot. On another occasion, when Father was dropping off the children following a parenting time visit, maternal grandfather "[b]umped chests" with Father, put his fists in Father's face, and wanted to fight Father. (Tr. Vol. 4 at 15).

[11] On August 27, 2020, Father and paternal grandparents awoke to a fire on paternal grandparents' front porch. An Alabama deputy state fire marshal investigated the fire, smelled gasoline on the front porch, and subsequently determined that the fire had been intentionally set. The same day as the fire, Mother posted three images on social media. The first post included music in the background with the lyrics, "Ain't No Rest for the Wicked." (Ex. Vol. 1 at 94). The second post included the words, "DON'T LET IDIOTS RUIN YOUR DAY." (Ex. Vol. 1 at 95). The third post included an image of Mother leaning against a truck. The image was captioned, "If you don't threaten to roll your truck into a field and set it on fire at least once a day you must pay other people to." (Ex. Vol. 1 at 103). Father saw Mother's posts and took screenshots of them.

[12] A few days later, Mother posted on social media a photograph of a person smoking a cigarette that was captioned: "Rioters: 'We're coming for the suburbs'" and "Jesus watching me fill my sprinklers with gasoline after loading mags full of tracers!" (Ex. Vol. 1 at 96). The following day, Mother posted on

social media an image that provided, "How Each Sign SHOWS ANGER:[,]" which included "Scorpio: Murders you in your sleep[.]" (Ex. Vol. 1 at 97). Father saw Mother's posts and took screenshots of them.

[13] Two weeks later, in mid-September 2020, Mother posted on social media an image of fried chicken that included the song "House Fire" by Tyler Childers. (Ex. Vol. 1 at 98). One month later, Mother posted on social media an image taken from the front seat of a vehicle showing rain on the windshield. Mother's post again included the song "House Fire" by Tyler Childers. (Ex. Vol. 1 at 99). The following day, Mother posted an image on social media that included the words, "WHITE GIRLS BE LIKE FARMHOUSE BUT DON'T KNOW THE DIFFERENCE BETWEEN STRAW AND HAY ON THEIR PORCH." (Ex. Vol. 1 at 100). That same day, Mother posted on social media an image that included the words, "Nothing lights a fire under you like somebody saying, You're not going to be able to do it." (Ex. Vol. 1 at 102). Father saw Mother's posts and took screenshots of them. This was the last of Mother's social media post that referenced fires.

[14] Concerned that the fire at paternal grandparents' home had been intentionally set and that Mother had been posting on social media images, songs, and captions that had referenced fires, Father believed that Mother or one of her family members had set the fire. Nevertheless, Father continued to drive from Alabama every other weekend to exercise his parenting time with the children. Father also continued to drive to Indiana when he did not have parenting time to watch the children's sports events and to participate in activities, such as

Pumpkin Palooza at the children's school and a swimming pool party. Father kept in frequent contact with the children's teachers, participated in virtual parent-teacher conferences, and had lunch with the children at school. The children also spent time in Alabama with Father and paternal grandparents, and Father took the children to Alabama football games and Talladega. Father also took the children on vacations. Further, Father, who plays musical instruments in churches in both Indiana and Alabama, has encouraged the children to be involved in music. In this regard, Father purchased a set of drums and a guitar for the children.

[15] In 2022, Abigail Monroe ("Monroe") told her mother that, in August 2020, she had travelled to Alabama with John Morrison ("Morrison") and that Morrison had set fire to paternal grandparents' front porch. Morrison is maternal grandmother's brother and Mother's uncle. Monroe's mother contacted Father and told him that Morrison had set the fire.

[16] In May 2023, Father filed a petition to modify custody of the children. In this petition, Father alleged that he had received information that Morrison had set the fire to paternal grandparents' front porch. According to Father's petition, maternal grandmother had told Morrison that Father had molested the children and that she wanted Morrison to "run [Father] off the road in a car or dispose of him by using fire." (App. Vol. 2 at 103). Father further alleged that, in August 2020, Morrison had driven to Alabama, poured gasoline on paternal grandparents' front porch, lit a match, and set the front porch on fire while Father and paternal grandparents had been sleeping. Father also alleged that

the State of Alabama had charged Morrison with three counts of attempted murder and three counts of arson. In addition, Father alleged that Mother had "made certain posts on the internet close in time to the fire regarding arson, burning at night and other strange posts relating to fire." (App. Vol. 2 at 103). Father also alleged that when it was time for the children "to return to Indiana after visiting in Alabama, they become very emotional, start crying and beg [Father] and his family not to return them." (App. Vol. 2 at 103). Father further alleged that the children had "asked him numerous questions regarding arson, fires and the ability to be safe indicating to him that the children [had] overheard conversations in the home of [Mother] and [maternal grandparents]." (App. Vol. 2 at 104).

[17] The trial court held a two-day hearing on Father's petition in April and May 2024 and heard the facts as set forth above. In addition, Morrison, who traveled to Indiana from Alabama, where he was incarcerated for the Alabama charges, testified about the facts surrounding the fire.[1] Specifically, Morrsion testified that he had driven to Alabama multiple times before the fire because maternal grandmother had asked him to "see what [Father] was doing down

---

[1] The trial court advised Morrison that he had the right to remain silent and that anything he said could be used against him in a court of law. Morrison responded that he understood and told the trial court that his Alabama attorney had told him to go to Indiana and to tell the truth. In the middle of the hearing, the trial court telephoned Morrison's Alabama attorney, and the court reporter transcribed the telephone conversation. Morrison's attorney told the trial court that Morrison had already confessed to the Alabama charges. Thus, according to Morrison's attorney, Morrison would not be discussing the facts of the case for the first time at the hearing. Thereafter, the trial court told Morrison that even if he had previously given a police statement, he was not required to answer questions at the hearing. However, Morrison told the trial court that he wanted to testify.

there and what, kind of, conditions the [children] were staying in and . . . if [Father] had another woman down there and . . . things of that nature." (Tr. Vol. 3 at 176). Each time that Morrison had gone to Alabama, maternal grandmother had known Father's exact location, and Morrison believed that maternal grandmother was somehow tracking Father.

[18] Morrison further testified that maternal grandmother had subsequently told him that Father had been molesting the children and that she wanted Father "to go away and not come back." (Tr. Vol. 3 at 191). Morrison believed that maternal grandmother wanted him to kill Father. However, according to Morrison, he had not gone to Alabama to kill anyone. Rather, he wanted to scare Father enough that Father would not ever take the children back to Alabama.

[19] In addition, Morrison testified that on August 27, 2020, he had driven to Alabama and had started the fire at paternal grandparents' home. Morrison specifically explained that he had had a can of gasoline in the back of his truck because he had been mowing the grass before leaving Indiana. According to Morrison, he had driven to paternal grandparents' home, run to the house with the gas can, fallen, and dropped the gas can. Morrison further testified that when he had picked up the gas can, he had spilled gas on the bushes and the front porch. Morrison also testified that he had lit the gasoline with his lighter and that there had been "a big flash. Poof. . . . It [had] about knocked [Morrison] down." (Tr. Vol. 3 at 198).

[20] Morrison further testified that after he had returned to Indiana, he had told maternal grandmother that the "whole front porch had caught on fire[.]" (Tr. Vol. 3 at 201). According to Morrison, maternal grandmother had responded, "maybe [Father] won't show up." (Tr. Vol. 3 at 201). In addition, Morrison testified that maternal grandmother had asked him to go back to Alabama after the fire. However, according to Morrison, he had refused and had told maternal grandmother that he "was done." (Tr. Vol. 3 at 202).

[21] Also, at the hearing, Father's counsel called maternal grandmother to the witness stand to testify. Maternal grandmother testified that she and her husband owned a trucking company and that she was Mother's mother. However, when Father's counsel asked her questions about whether she had asked Morrison to go to Alabama, whether Mother had been present during maternal grandmother's conversations with Morrison, and whether Mother had known what had been transpiring, maternal grandmother invoked her Fifth Amendment privilege.

[22] During twenty-nine-year-old Mother's testimony, the trial court admitted into evidence the screenshots that Father had taken of Mother's social media posts. When questioned about the social media posts that included images, songs, and captions that had referenced fires and that had been posted near the time of the fire, Mother denied posting two of the images. Mother further alleged that the other posts had been "extremely cherry-picked." (Tr. Vol. 3 at 83). Mother also testified that she had not learned about the fire until three years later, when Father had filed his petition to modify custody. She also acknowledged that

after she had learned about the fire, she had not contacted Father or paternal grandparents to see if they were okay.

[23] Forty-one-year-old Father also testified at the hearing. According to Father, he had recently purchased a new home in Alabama. Father also testified that he and the children had a "tight bond." (Tr. Vol. 4 at 24). Father further explained that he enjoys spending time with the children, laughing with them, learning from them, and teaching them. In addition, Father testified that the children had initiated conversations indicating their desire to live with him in Alabama.

[24] Lastly, the children's third-grade teachers testified that the children are very good students. The teachers also testified that they would expect the children to perform at the same academic levels if they transferred to another school.

[25] Following the hearing, the trial court issued a seventeen-page thoughtful and detailed order that included the following findings of fact and conclusions thereon:

> 9. Father is engaged with the Children. He has travelled to [Indiana] to be with them outside of his regular parenting time. Father attended kindergarten graduation, Christmas programs, and sporting events. His relationship with the Children is strong. Father takes the Children to aquariums, baseball games, amusement parks, football games, and car races.
>
> *     *     *     *     *
>
> MODIFICATION OF PHYSICAL CUSTODY

* * * * *

47. According to IC 31-17-2-8, in determining the best interests of the child, the court shall consider all relevant factors. Of the factors specifically enumerated in the statute, the Court finds the following to be applicable: the age...of the child; the wishes of the child's parents; the interaction and interrelationship of the child with the child's parents, sibling, and any other person who may significantly affect the child's best interests; and the child's adjustment to the child's home, school, and community.

    a.    The age of the children is relevant to the extent that they are old enough to understand their parents are frequently in conflict and that the relationship between the two families is exceedingly poor.

    b.    Their age is also relevant to the extent that youth are resilient, and the Court is confident both children here can successfully navigate the future in the event of a custody change.

    c.    The wishes of the parents are clear. Father seeks to have sole custody of the children. Mother seeks to retain sole custody of the children.

    d.    The Children[']s[] interactions with their parents, each other, and those around them, demonstrate the boys are smart, well-mannered, typical boys who have parents who love and care for them very much. Each have lots of friends, exhibit leadership, and do well at school.

    e.    The Children are well adjusted to home and school. They are well adjusted to their community in both [Indiana] and Alabama.

48. The trial court must consider all relevant factors, not only those specifically enumerated. Doubiago v. McClarney, 659

N.E.2d 1086 (Ind. Ct. App. 1995). The August 27, 2020 arson is highly relevant to the Court's analysis here.

49. The Court concludes that Mr. Morrison did set a fire at the [paternal grandparent's] home on August 27, 2020. Mr. Morrison's testimony was credible and supported by forensics and photographs in this regard. His conduct seriously endangered the health and lives of Father and his parents.

50. Mr. Morrison's testimony is corroborated by [maternal grandmother]'s assertion of her 5th Amendment Privilege, from which the Court draws an adverse inference.

51. Although the refusal to testify in a civil case cannot be used against the one asserting the privilege in a subsequent criminal proceeding, the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness' refusal to testify. Gash v. Kohm, 476 N.E.2d 910, 913 (Ind. Ct. App. 1985).

\* \* \* \* \*

56. The Court concludes it is more probably true than not true that [maternal grandmother] was involved in Mr. Morrison's efforts to bring harm to Father.

57. The Court credits Mr. Morrison's testimony that he spoke with [maternal grandmother] and she asked him to take action against Father.

58. The Court does not conclude, however, that Mother was involved in the planning of, or the acts taken against, Father.

59. But the Court had ample opportunity to observe Mother in court, both on and off the witness stand. Her complete lack of credibility during testimony regarding the social media posts gives the Court great pause. The Court simply does not credit her version that some of the social media posts were altered in a

way meant to mislead the Court. It makes no sense that some of the posts were hers and some were fabricated.

60. Mother's assertion that the posts were "cherry picked" was not corroborated by anything other than her testimony that they were so.

61. The Court concludes that the posts were either completely random and unintentional, or they were meant to taunt Father regarding the arson. Given Mother's lack of credibility, the Court concludes the latter.

62. Mother's animated demeanor and gratuitous answers from the stand came in stark contrast to her behaviors while evidence of the fire came in through other witnesses. Then she was despondent, frowned frequently, appearing almost resigned. When questioned about whether she knew about placing GPS trackers on Father's vehicle, Mother's answers were barely audible, and at times included mere head-shakes.

63. Mother was quick to firmly and categorically disparage Father's parenting skills, seeming to suggest Father's ability to care for the Children was beyond remedy. Mother hurriedly concluded one answer with an allegation Father physically abused her in the past. This was not responsive to the question asked, nor did counsel ask follow-up questions on the matter.

64. Father, in contrast, was credible. He quickly conceded what might be considered facts damaging to his case. He provided firm explanations for difficult questions. Father explained without hesitation that he took screen-shots from Instagram and created the specific exhibits entered into evidence. He expressed reluctance at the Court interviewing the Children out of fear it might alienate them not just from him, but Mother too.

65. The Court concludes that while Mother may not have been involved in the efforts to bring harm to Father, it is more probably true than not true that Mother knew about the fire soon

after it was set in August 2020, and certainly long before the Motion for Modification was filed by Father in May 2023.

66. And regardless of when Mother learned about the fire, she made no effort to communicate any concern for the safety and well-being of Father and grandparents of her Children.

67. These conclusions shed significant light on Mother's character and her fitness to be sole custo[dial] parent.

68. A person's character may be a material fact in deciding who should have custody of children as fitness to provide care is of paramount importance. Lei[s]ure v. Wheeler, 828 N.E.2d 409, 419 (Ind. Ct. App. 2005).

69. Here, Mother's poor character is a material factor in determining whether custody should be modified. The Court is concerned that the long-term influence a primary physical and sole legal custodian who has demonstrated such indifference to the perpetration of violence against the other parent will adversely affect the Children[']s[] emotional growth, health, and well-being.

70. Another factor that cannot be ignored is the nature of influence [maternal grandfather], who has exhibited violent behaviors against Father *in the presence of the Children*, and [maternal grandmother], who was involved in Mr. Morrison's efforts to harm Father, would continue to have on the Children if they remain with Mother under the Court's current custody order.

71. The Court concludes that there has been a substantial change in circumstances in the factors listed at IC 31-17-2-8 and all other relevant factors applicable to this case. The Court finds it to be in the best interests of the Children that Father be awarded physical custody of the Children.

(App. Vol. 3 at 76, 83-84, 86-88) (footnote omitted).

Mother now appeals.

## Decision

When reviewing cases involving the modification of child custody, especially one as contentious as the one before us, we acknowledge the well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (cleaned up). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Id.* (cleaned up). "Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time." *Hahn-Weisz v. Johnson*, 189 N.E.3d 1136, 1141 (Ind. Ct. App. 2022) (cleaned up). "Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." *Id.* (cleaned up).

Here, it appears that neither party requested special findings under Indiana Trial Rule 52(A) and that the trial court entered its findings sua sponte. As to the issues covered by the findings, we apply the two-tiered standard of whether

the evidence supports the findings and whether the findings support the judgment. *McDaniel v. McDaniel*, 150 N.E.3d 282, 289 (Ind. Ct. App. 2020), *trans. denied*. We review any remaining issues under the general judgment standard and will affirm the judgment if it can be sustained on any legal theory consistent with the evidence. *Id.* "'We may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court.'" *Id.* (quoting *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013), *aff'd on reh'g*). Clear error occurs when our review of the evidence most favorable to the trial court's judgment leaves us firmly convinced that a mistake has been made. *Quinn v. Quinn*, 62 N.E.3d 1212, 1220 (Ind. Ct. App. 2016). We now turn to the issue in this case.

[29]   Mother argues that the trial court abused its discretion in modifying custody of the children in favor of Father. We disagree.

[30]   We review custody modifications for an abuse of discretion. *Hecht v. Hecht*, 142 N.E.3d 1022, 1028 (Ind. Ct. App. 2020). On review, we will not reweigh the evidence, judge the credibility of witnesses, or substitute our judgment for that of the trial court. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 946 (Ind. Ct. App. 2006). We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. *Id.* "'[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal.'"

*McDaniel*, 150 N.E.3d at 288 (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)).

[31] INDIANA CODE § 31-17-2-21 provides that a trial court may not modify an existing child custody order unless: (1) the modification is in the best interests of the child; and (2) there has been a substantial change in one or more of the statutory factors that are outlined in INDIANA CODE § 31-17-2-8.

[32] INDIANA CODE § 31-17-2-8 specifically provides as follows:

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. . . . The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parent or parents;
> >
> > (B) the child's sibling; and
> >
> > (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
> > (A) home;
> >
> > (B) school; and
> >
> > (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian[.]

IND. CODE § 31-17-2-8.

[33] Because the statute requires the trial court to consider *all* relevant factors, *including* the statutory factors, this list of statutory factors is non-exhaustive. *See Matter of J.M.*, 246 N.E.3d 303, 310 (Ind. Ct. App. 2024) (explaining that the statute provides a non-exhaustive list of potentially relevant factors). *See also Doubiago v. McClarney*, 659 N.E.2d 1086, 1087 (Ind. Ct. App. 1995) (explaining that a prior version of the statute with the same language required the trial court to consider all relevant factors, not only those specifically enumerated in the statute), *trans. denied*.

[34] We also note that this Court has previously explained that "a person's character may be a material fact in deciding who should have custody of children as fitness to provide care is of paramount importance." *Leisure v. Wheeler*, 828 N.E.2d 409, 419 (Ind. Ct. App. 2005). "When character has been put in issue by the pleadings as typically occurs in child custody cases, evidence of character must be brought forth." *Id*. "This conclusion is consistent with our common law, which has provided that in civil cases character evidence will be admissible if the nature of the underlying action places a person's character at issue." *Id*.

[35] Mother first argues that there was no substantial change in one or more of the statutory factors. However, our review of the evidence reveals a substantial change in several of the statutory factors. First, the children, who were four years old when the previous custody order was issued, are now nine years old. Further, although Father agreed for Mother to have custody of the children in 2019, Father now believes that it is in the children's best interests for him to have custody. Also, the children have developed a tight bond with Father, and during their visits to Alabama, they have adjusted to Father's community.

[36] In addition, as noted by the trial court, there has been a substantial change in other factors that are relevant to the children's custody. Specifically, Morrison set fire to paternal grandparents' front porch and seriously endangered the lives of Father and paternal grandparents, who were sleeping in the home when Morrison set the fire. Further, it was maternal grandmother who had asked Morrison to harm Father. In addition, Mother taunted Father about the fire with her social media posts, which included images, songs, and captions that referenced fires. We further note that maternal grandfather has exhibited violent behaviors against Father. These substantial changes in both the statutory and other relevant factors support the trial court's modification of the children's custody.

[37] We further note that the trial court specifically found that Mother's testimony lacked credibility and that Father's testimony was credible. Mother's arguments ask us to judge the credibility of witnesses and substitute our

judgment for that of the trial court. This we cannot do. *See Kondamuri*, 852 N.E.2d at 946.

[38] Mother also argues that the modification of custody was not in the children's best interests. However, our review of the record reveals that despite living in Alabama, Father has developed a close bond with the children. Specifically, for the past five years, Father has driven from Alabama to Indiana every other weekend to engage in parenting time with the children. Further, Father purchased a home in Indiana so that he would have a place to take the children during his parenting time. Father has also driven to Indiana when he did not have parenting time to attend the children's sports events and school activities, and he has taken the children on vacation. In addition, Father has maintained frequent contact with the children's teachers and attended virtual parent-teacher conferences. Further, Father has encouraged his children to be involved in music and has purchased musical instruments for them. Lastly, Father now owns a home in Alabama where he and the children will live. This evidence supports the trial court's finding that a modification of custody was in the children's best interest. The trial court did not abuse its discretion when it modified custody of the children in favor of Father.

[39] Affirmed.

Bradford, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

R. Patrick Magrath
Merritt K. Alcorn
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana


ATTORNEY FOR APPELLEE

Paul L. Jefferson
SLS Group, LLC
Carmel, Indiana